**Hubert DAYE et al.**

v.

**The COMMONWEALTH OF PENN-SYLVANIA et al.**

**Mindy MEYERS, an infant, by her parent and natural guardian, Marvin Meyers, et al.**

v.

**The COMMONWEALTH OF PENNSYLVANIA.**

**Civ. A. Nos. 71–1726, 71–2167.**

United States District Court,
E. D. Pennsylvania.

June 30, 1972.

James B. Zane, Zane & Zane, New York City, for plaintiff Mindy Meyers and others.

Richard F. Stevens, Butz, Hudders & Tallman, Allentown, Pa., for plaintiff Hubert Daye and others.

D. J. Ryan, Philadelphia, Pa., for individual defendants.

Edward A. Hosey, Edward V. A. Kussy, Asst. Attys. Gen., Harrisburg, Pa., for defendant Com. of Pa.

## OPINION AND ORDER

TROUTMAN, District Judge.

### I.

On July 15, 1970, a chartered bus, carrying a group of school-age children and their counsellors, left Lawrence, New York, enroute to the Pennsylvania Dutch country. In an intermittent rain, the bus proceeded in a westerly direction along U.S. Route 22 (Interstate 78) in Pennsylvania [hereinafter U.S. 22]. The wet pavement allegedly precipitated a skid, causing the bus to rotate clockwise 180°, crash into the guardrails, and tumble over an embankment. As a result of the accident, seven students were killed and forty-seven others injured.

Thereafter, two suits, arising out of this accident, were instituted in this Court against the Commonwealth of Pennsylvania. The first suit purports to be a class action, filed by Hubert Daye (the bus driver) and Tedesco Bus Company (the bus owner), each in their own right and on behalf of all passengers on the bus at the time of the accident. [Daye] The second suit was filed on behalf of two children who were passengers in the bus and injured in the ac-

cident. Both actions base the liability of the Commonwealth on its alleged failure to use reasonable care in the design,[1] construction [2] and maintenance [3]

1. 23 U.S.C. § 106(a) provides:

"(a) Except as provided in section 117 of this title, the State highway department shall submit to the Secretary for his approval, as soon as practicable after program approval, such surveys, plans, specifications, and estimates for each proposed project included in an approved program as the Secretary may require. The Secretary shall act upon such surveys, plans, specifications, and estimates as soon as practicable after the same have been submitted, and his approval of any such project shall be deemed a contractual obligation of the Federal Government for the payment of its proportional contribution thereto. In taking such action, the Secretary shall be guided by the provisions of section 109 of this title."

23 U.S.C. § 109(a) provides:

"(a) The Secretary shall not approve plans and specifications for proposed projects on any Federal-aid system if they fail to provide for a facility (1) that will adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety, durability, and economy of maintenance; (2) that will be designed and constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs of each locality."

23 U.S.C. § 109(d) provides:

"(d) On any highway project in which Federal funds hereafter participate, or on any such project constructed since December 20, 1944, the location, form and character of informational, regulatory and warning signs, curb and pavement or other markings, and traffic signals installed or placed by any public authority or other agency, shall be subject to the approval of the State highway department with the concurrence of the Secretary, who is directed to concur only in such installations as will promote the safe and efficient utilization of the highways."

23 U.S.C. § 109(e) provides:

"(e) No funds shall be approved for expenditure on any Federal-aid highway, or highway affected under chapter 2 of this title, unless proper safety protective devices complying with safety standards determined by the Secretary at that time as being adequate shall be installed or be in operation at any highway and railroad grade crossing or drawbridge on that portion of the highway with respect to which such expenditures are to be made."

2. 23 U.S.C. § 114(a) provides:

"(a) The construction of any highways or portions of highways located on a Federal-aid system shall be undertaken by the respective State highway departments or under their direct supervision. Except as provided in section 117 of this title, such construction shall be subject to the inspection and approval of the Secretary. The construction work and labor in each State shall be performed under the direct supervision of the State highway department and in accordance with the laws of that State and applicable Federal laws. Construction may be begun as soon as funds are available for expenditure pursuant to subsection (a) of section 118 of this title. On any project where actual construction is in progress and visible to highway users, the State highway department shall erect such informational sign or signs as prescribed by the Secretary, identifying the project and the respective amounts contributed therefor by the State and Federal Governments."

3. 23 U.S.C. § 116(a) provides:

"(a) It shall be the duty of the State highway department to maintain, or cause to be maintained, any project constructed under the provisions of this chapter or constructed under the provisions of prior Acts. The State's obligation to the United States to maintain any such project shall cease when it no longer constitutes a part of a Federal-aid system."

23 U.S.C. § 116(c) provides:

"(c) If at any time the Secretary shall find that any project constructed under the provisions of this chapter, or constructed under the provisions of prior Acts, is not being properly maintained, he shall call such fact to the attention of the State highway department. If, within ninety days after receipt of such notice, such project has not been put in proper condition of maintenance, the Secretary shall withhold approval of further projects of all types in the entire State until such project shall have been put in proper condition of maintenance, unless such project is subject

of U.S. Route 22 in violation of the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq., and the Highway Safety Act, 23 U.S.C. § 401 et seq.[4] Specifically, the gravamen of plaintiffs' allegations is that in the light of the high number of reported accidents along this portion of U.S. 22, the Commonwealth failed to use reasonable care to prevent the drainage of surface water across the roadway and to insure the installation of adequate guardrails [5].

The Commonwealth has moved to dismiss both complaints on three grounds, alleging that (1) the Court lacks jurisdiction to entertain these actions; (2) these actions are barred by the Commonwealth's immunity under the Eleventh Amendment,[6] and its sovereign im-

to an agreement pursuant to subsection (b) of this section, in which case approval shall be withheld only for secondary or urban projects in the county or municipality where such project is located."

4. 23 U.S.C. § 402(a) provides:

"(a) Each State shall have a highway safety program approved by the Secretary, designed to reduce traffic accidents and deaths, injuries, and property damage resulting therefrom. Such programs shall be in accordance with uniform standards promulgated by the Secretary. Such uniform standards shall be expressed in terms of performance criteria. Such uniform standards shall be promulgated by the Secretary so as to improve driver performance (including, but not limited to, driver education, driver testing to determine proficiency to operate motor vehicles, driver examinations (both physical and mental) and driver licensing) and to improve pedestrian performance. In addition such uniform standards shall include, but not be limited to, provisions for an effective record system of accidents (including injuries and deaths resulting therefrom), accident investigations to determine the probable causes of accidents, injuries, and deaths, vehicle registration, operation, and inspection, highway design and maintenance (including lighting, markings, and surface treatment), traffic control, vehicle codes and laws, surveillance of traffic for detection and correction of high or potentially high accident locations, and emergency services. Such standards as are applicable to State highway safety programs shall, to the extent determined appropriate by the Secretary, be applicable to federally administered areas where a Federal department or agency controls the highways or supervises traffic operations. The Secretary shall be authorized to amend or waive standards on a temporary basis for the purpose of evaluating new or different highway safety

programs instituted on an experimental, pilot, or demonstration basis by one or more States, where the Secretary finds that the public interest would be served by such amendment or waiver."

5. The plaintiffs in the *Meyers* case have incorporated into their brief the Highway Accident Report of the National Safety Board, whose conclusions we shall accept for the purpose of these motions. As to the probable cause of this accident, the Board concluded:

"The National Transportation Safety Board determines that the probable cause of this accident was either dynamic or viscous hydroplaning of the front wheels of the bus which initiated a skid from which the driver could not recover. Contributing factors included low basic skid resistance of the pavement in wet weather, and the probable presence of water draining across the pavement in an abnormal manner. The fatalities and injuries were caused by an ineffective highway guardrail which failed to prevent the bus from rolling down an embankment, by bus windows which failed to prevent ejection of some passengers, and in some cases, by the absence of occupant restraints."

For the purpose of these motions we shall not refer to other portions of the report suggesting additional or other contributing causes of this unfortunate accident.

6. The Eleventh Amendment to the United States Constitution provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State".

Thus, under the Eleventh Amendment the federal courts lack authority to entertain a suit brought by a private party against a state without its consent. Ford Motor Co. v. Dep't. of Treasury, State of Indiana, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

munity;[7] and (3) the complaint fails to state a claim upon which relief can be granted. Plaintiffs, on the other hand, argue that by voluntarily accepting federal funds under the Federal-Aid Highway Act and by entering into interstate commerce in the construction of interstate highways, the Commonwealth waived any immunity which ordinarily would have been available to it. Plaintiffs further argue that the Federal-Aid Highway Act and the Highway Safety Act create an implied cause of action for injuries resulting from any violation of the standards set forth therein or regulations promulgated thereunder.

### A. Jurisdiction

■■ Both actions have alleged as their jurisdictional basis a federal question arising under the Constitution and laws of the United States. In the *Daye* case, plaintiffs have alleged diversity of citizenship as an alternative jurisdictional basis. In so far as jurisdiction over the Commonwealth in *Daye* is based on diversity of citizenship, this Court lacks such jurisdiction, for it is well established that a state is not a person for the purposes of diversity jurisdiction. State Highway Comm'n. of Wyoming v. Utah Construction Co., 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262 (1929); O'Neill v. Commonwealth of Pennsylvania, 459 F.2d 1 (3rd Cir., 1972). Moreover, a state cannot waive its lack of status as a citizen for the purpose of diversity jurisdiction. Harris v. Pennsylvania Turnpike Comm'n., 410 F.2d 1332, 1334 n.1 (3rd Cir. 1969), cert. denied, 396 U.S. 1005, 90 S.Ct. 558, 24 L.Ed.2d 497 (1970); Krisel v. Duran, 386 F.2d 179, 181 (2d Cir. 1967), cert. denied 390 U.S. 1042, 88 S.Ct. 1635, 20 L.Ed.2d 303 (1968).

■ Plaintiffs have alleged that this Court has jurisdiction over these actions in that their subject-matter raises substantial federal questions. Initially, plaintiffs argue that the issue whether the Commonwealth waived its Eleventh Amendment immunity presents a federal question. In Parden v. Terminal R. Co. of Ala., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the Supreme Court considered this identical question, holding:

> "Where a State's consent to suit is alleged to arise from an act not wholly within its own sphere of authority but within a sphere—whether it be interstate compacts or interstate commerce—subject to the constitutional power of the Federal Government, the question whether the State's act constitutes the alleged consent is one of federal law." 377 U.S. at 197, 84 S.Ct. at 1215.

See also Chesapeake Bay Bridge & Tunnel Dist. v. Lauritzen, 404 F.2d 1001, 1003–1004 (4th Cir. 1968). In the instant case, the issue whether Pennsylvania's affirmative actions in accepting federal highway grants and in its entry into the field of interstate commerce constitutes a waiver of its Eleventh Amendment immunity manifestly presents a federal question within the purview of the *Parden* decision.

In further support of this Court's jurisdiction, plaintiffs maintain that the issue whether a violation of the standards established in the Federal-Aid Highway Act or the Highway Safety Act gives rise to an implied cause of action to recover damages for personal injuries also constitutes a federal question. We conclude that this issue presents a federal question, for in Smith v. Kansas City Title & Trust Co., 255

---

7. Article I, Section 11 of the Pennsylvania Constitution, P.S., provides:
"* * * Suits may be brought against the Commonwealth in such manner, in such courts, and in such cases as the Legislature may by law direct." The Pennsylvania courts have held that in the absence of a statute authorizing suits against the Commonwealth, the state is immune from the negligence of its agents and employees on the construction, maintenance and repair of a highway. Rader v. Pennsylvania Turnpike Comm'n., 407 Pa. 609, 611, 182 A.2d 199 (1962).

U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), the Supreme Court stated the test as follows:

"[W]here it appears from the bill or statement of the plaintiff that the right to relief depends upon the construction or application of the Constitution or laws of the United States, and that such federal claim is not merely colorable, and rests upon a reasonable foundation, the District Court has jurisdiction * * *". 255 U.S. at 199, 41 S.Ct. at 245.

Since plaintiffs' right to relief, if any, depends on our construction of the federal highway legislation, we have jurisdiction to determine whether such statutes create, by implication, a cognizable civil remedy.

**B. The Class Action**

■■ In the *Daye* case, the named plaintiffs, Hubert Daye, Tedesco Bus Company, Frank Tedesco, and Academy Charter Service, Inc., purport to represent a class consisting of those passengers killed or injured in the accident of July 15, 1970. In order to proceed as a class, the burden is on the plaintiff to establish the right to do so. Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 457 (E.D.Pa. 1968). In the instant case, plaintiffs must satisfy the prerequisites of Rule 23(a) [8] and Rule 23(b) (3) [9] of the Federal Rules of Civil Procedure. Plaintiffs vigorously argue that since the liability of the Commonwealth of Pennsylvania is a question common to all members of the purported class and since this question predominates over all others, this suit is appropriate for determination as a class action. Several considerations, however, have convinced us that this suit is not properly maintainable as a class action.

■■ Initially, it is well established that the plaintiff-representative must be a member of the class which he purports to represent. Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). In this case, the purported class consists of those injured or killed in the bus accident in question. The only named plaintiff who could conceivably represent this class as a member is Hubert Daye, the driver himself. The remaining named plaintiffs are, in no way, representative of this class. Secondly, there arises a substantial question of adequacy of representation by the named plaintiffs. Adequacy of representation not only requires a coextensiveness of interests between the class and its representatives (present here in the common question of the liability of Pennsylvania), but also requires an absence of antagonistic interests. 3B J. Moore, Federal Practice ¶23.07 [1], ¶23.07[3] (2d ed. 1969). Several ac-

---

8. Rule 23(a) F.R.Civ.P. provides:
 "(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

9. Rule 23(b) (3) F.R.Civ.P. provides:
 "(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 * * * * *

 "(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

tions, arising from this accident, have already been filed against the bus company not only in this Court, but also in New York. Thirdly, we have found the Notes of the Advisory Committee to Rule 23 as revised in 1966 instructive. There, the Committee noted that "mass accidents" resulting in injuries to numerous persons are ordinarily inappropriate because of the likelihood that significant questions would arise not only of damages, but also of liability and defenses to liability. To permit such cases to continue as class actions, the Committee continued, would cause the case to degenerate into multiple law suits separately tried. *See also* Hobbs v. Northeast Airlines, Inc., 50 F.R.D. 76 (E.D. Pa.1970). In this instant case, this Court would be confronted with not only personal injury claims but also death claims. Moreover, assuming the Commonwealth is found liable, the measure of damages may differ in each instance in that the class would consist of members from both New York and New Jersey. Finally, we must consider the interest of the members of the class in individually controlling the prosecution of separate actions, Rule 23(b) (3) (A), and the extent and nature of any litigation concerning the controversy already evident from the commencement of actions by members of the class, Rule 23(b) (3) (B). As previously mentioned, the representative parties have been sued by at least six members of the class in the courts of New York, and two members of the Class [Meyers] have filed suit in this Court against the Commonwealth. In the light of the significant number of actions already commenced, it is reasonable to conclude that each member of the purported class has a substantial interest in controlling his own litigation. Moreover, it is illogical to conclude that one who is a defendant in other actions instituted by members of the class and arising out of the same accident could here adequately and properly represent the class as plaintiffs. For these reasons, we conclude that this action is not maintainable as a class action in that it fails to meet the prerequisites set forth in Rule 23 of the Federal Rules of Civil Procedure. Accordingly, we will dismiss the *Daye* complaint in so far as it alleges a class action.

## C. *The Eleventh Amendment Waiver*

The Eleventh Amendment expressly denies authority to the federal courts to entertain a suit brought by private parties against a state without its consent. Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). The mere presence of a federal question does not, in and of itself, divest a state of its immunity under the Eleventh Amendment. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1899). The state may, however, consent to be sued in federal court and, thereby, waive its immunity under the Eleventh Amendment. Where the issue of waiver arises, the general rule is that a waiver of immunity will be found only where stated in the most express language, or where presented by such overwhelming implication from the text so as to leave no room for any other reasonable construction. Murray v. Wilson Distilling Co., 213 U.S. 151, 171, 29 S.Ct. 458, 53 L.Ed. 742 (1909); DeLong Corp. v. Oregon State Highway Comm'n., 233 F.Supp. 7 (D.Or.1964). Furthermore, a heavy burden is on the plaintiff to show an "intentional relinquishment or abandonment of a known right or privilege". Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). See also Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); DeLong Corp. v. Oregon State Highway Comm'n., *supra*, 233 F.Supp. at 19.

Plaintiffs argue that the Commonwealth of Pennsylvania has impliedly waived its Eleventh Amendment immunity,[10] relying on Petty v. Tennes-

---

10. Plaintiffs have not designated nor have we found any express waiver of the Commonwealth's Eleventh Amendment immunity either in the Pennsylvania stat-

see-Missouri Bridge Comm'n., 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); Parden v. Terminal R. Co. of Ala., 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964) and their progeny. Specifically, plaintiffs argue that the Commonwealth waived its immunity by implication by affirmatively and voluntarily (1) applying for and accepting federal funds under the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq., and (2) engaging in interstate commerce. We now examine the cases cited by plaintiffs to determine whether they provide authority to imply a waiver of the state's immunity under the facts and circumstances of this case.

In Petty v. Tennessee-Missouri Bridge Comm'n., 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), plaintiff brought suit under the Jones Act, 46 U.S.C. § 688, to recover damages for the death of her husband aboard defendant's ferry boat. Defendant was a bi-state agency created by an interstate compact between Tennessee and Missouri pursuant to Article I, Section 10 of the Constitution. The Commission was given the power "to contract, to sue and be sued in its own name". Further, in approving the compact, Congress added a proviso to the effect that the terms of the contract would not be construed "to affect, impair, or diminish any right, power or jurisdiction of * * * any court * * * of the United States, over or in regard to any navigable waters, or any commerce between the States * * *." The Supreme Court held initially that since the alleged waiver was contained in an interstate compact, its interpretation was a matter of federal law. Thereafter, the Court construed the congressional proviso as a deliberate reservation of jurisdiction in the federal court and concluded that the "sue and be sued" clause of the compact constituted a waiver of the state's immunity from suit. We find *Petty* inapposite to the facts of this case for sever-

al reasons. First, we read the language of the interstate compact and the Court's construction thereof to constitute an express waiver of Eleventh Amendment immunity. In the instant case, there is nothing even remotely similar to a sue or be sued clause or a reservation of jurisdiction in any of the applicable statutes. Secondly, under the terms of the agreement, the bi-state agency was operating over navigable waters—an area exclusively within the federal regulatory domain. Moreover, under the terms of the compact, federal jurisdiction over actions arising in navigable waters was expressly reserved, and Congress, under the Jones Act, had provided an express cause of action for torts occurring thereon. The compact was described as involving the " * * * launching of a governmental corporation into an industrial or business field * * *". 359 U.S. at 280, 79 S.Ct. at 789. In the instant case, the Commonwealth was operating exclusively within its own borders in an area traditionally within the state's regulatory domain. Congressional regulation in this area is limited to the controls it has secured under the Federal-Aid Highways Act, and this act provides no express cause of action to recover damages for personal injuries. Thus, we have concluded that *Petty* has little effect outside of its own limited factual situation and does not support the proposition of waiver in this case.

In Parden v. Terminal R. Co. of Alabama, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964) the Supreme Court expanded the rationale of *Petty*, holding that a state-owned and operated railroad, competing with privately-owned railroads in interstate commerce, is liable for personal injuries under the Federal Employers' Liability Act. The Court rejected the state's Eleventh Amendment immunity argument, reasoning that the state's operation of a railroad in interstate commerce must be in

utes, the application for and acceptance of federal highway funds, or in the appropriate federal statutes. Any waiver of the

state's immunity, therefore, is limited to waiver by implication.

subordination to the power of the federal government to regulate such commerce. By empowering Congress to regulate commerce, the states necessarily surrendered any portion of their sovereignty which would stand in the way of such regulation. We also conclude that *Parden* is inapposite under the facts of the present case. First, in *Parden,* the state, in operating its railroad across interstate boundaries, was acting in the capacity of a private enterprise and entered into the domain of exclusive federal regulation. In the case at bar, the state was performing its traditional state governmental function in designing, constructing, and maintaining highways within its own boundaries. Secondly, Congress in the FELA expressly conditioned the right to operate a railroad upon amenability to suit in federal court and created a specific cause of action to recover for personal injuries. In the instant case, the Commonwealth has received funds for interstate highways under a federal statutory scheme which provides no express and suggests no implied cause of action for violation of its provisions. We, therefore, conclude that *Parden* does not mandate a finding of waiver under the present facts.

Plaintiffs also rely on Chesapeake Bay Bridge and Tunnel Dist. v. Lauritzen, 404 F.2d 1001 (4th Cir. 1968). In *Lauritzen,* a shipowner sued the Bridge and Tunnel District, a political subdivision of the Commonwealth of Virginia, for damages when the hull of his ship struck a submerged light tower at the bridge-tunnel spanning the Chesapeake Bay. As required by federal statute, 33 U.S.C. § 401, the District submitted plans to the Army Corps of Engineers for the approval of the bridge-tunnel and received a permit to begin construction. In rejecting the State's Eleventh Amendment immunity argument, the Court of Appeals held:

"The supplication of the State, and her reception into the Federal domain, meant surrender, pro tanto and pro tempore, of State sovereignty and submission to the paramount overlordship

of the United States during the tenancy." 404 F.2d at 1003.

The result reached in *Lauritzen* was rejected by the Third Circuit in Red Star Towing & Transp. Co. v. Dep't. of Transp. of New Jersey, 423 F.2d 104 (3rd Cir. 1970), where the Court upheld the Eleventh Amendment immunity of the State of New Jersey on a virtually identical fact situation. The Court specifically disapproved of the contrary result reached in *Lauritzen,* holding it "arbitrary to say that the State consents to civil liability that could not be anticipated by reading the relevant federal statute". 423 F.2d at 106. Additionally, *Lauritzen* is strikingly similar to *Petty,* which we have previously found inapposite, in that the District's charter contained a "sue and be sued" clause, and the District entered into an exclusive realm of federal regulation—navigable waters.

Consequently, we conclude that *Petty, Parden* and *Lauritzen* do not support plaintiffs' theory of waiver, and plaintiffs cannot by a Procrustean stretch place themselves within the purview of those cases. We shall now undertake an independent analysis of plaintiffs' argument that by accepting federal funds under the Federal-Aid Highway Act and, thereby, entering into interstate commerce, the Commonwealth waived its Eleventh Amendment immunity.

### 1. *Acceptance of Federal Funds*

Plaintiffs argue that by participating in the federal highway program and by seeking and accepting funds thereunder, the state waived its immunity from suit. Plaintiffs rely heavily on Named Individual Members of San Antonio Conservation Soc'y. v. Texas Highway Dep't., 446 F.2d 1013 (5th Cir. 1971). Commencing in *1955* the Texas Highway Department planned and thereafter sought and obtained the approval of federal funds for a highway project extending from the San Antonio airport to San Antonio and through certain parklands. Upon objection by conservationists, in the course of tortious litigation in the

federal courts, and following a stay order entered by the Court on *May 27, 1971,* the Texas Highway Department, on June 1, 1971, sought to withdraw the project from all federal aid or involvement stating that the project would be completed exclusively with state funds. The Court understandably and logically responded that having voluntarily committed itself to this federally-aided project, the state was bound by federal law under the Supremacy Clause, United States Constitution, Art. VI, Cl. 2, and could not circumvent applicable federal statutes by belatedly suggesting the exclusive application of state funds. The Eleventh Amendment immunity was neither raised nor discussed and we find the decision unpersuasive and not controlling in the context of the instant case.

In Road Review League v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967),[11] and in DeLong Corp. v. Oregon State Highway Commission, 233 F.Supp. 7 (D.Ore. 1964), aff'd. 343 F.2d 911 (9th Cir. 1965), cert. denied, 382 U.S. 877, 86 S. Ct. 161, 15 L.Ed.2d 119 (1965),[12] the courts held that by participating in the federal highway program and seeking federal funds, the state does not waive its immunity from suit. In *DeLong,* the Court reasoned that any waiver of immunity must be made expressly or by overwhelming implication, and the mere acceptance of funds under the Federal-Aid Highway Act demonstrated neither express nor implied waiver. Although the factual situations of these cases differ from that in the instant case, their reasoning is highly pertinent, and we specifically adopt their holdings.

### 2. *Entry into Interstate Commerce*

Plaintiffs, alternatively, argue that the state, in constructing an interstate highway, has voluntarily entered into the federally regulated area of interstate commerce and, therefore, is amenable to suit for its acts or omissions in violation of federal regulations. Initially, it should be noted that the mere entry of a state into a field of congressional regulation will not subject it to suit by private individuals. Red Star Towing & Transp. Co. v. Dep't. of Transp. of New Jersey, *supra,* 423 F.2d at 106. In Mahler v. United States, 306 F.2d 713 (3rd Cir.) cert. denied 371 U.S. 923, 83 S.Ct. 290, 9 L.Ed.2d 231 (1962), the Court of Appeals stated:

"But it is clear nonetheless that the construction, maintenance and the regulations of highways have remained state functions. South Carolina [State] Highway Dep't. v. Barnwell Bros., 303 U.S. 177, 187, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938). In the cited case Mr. Justice Stone said: 'From the beginning it has been recognized that a state can, if it sees fit, build and maintain its own highways, canals and railroads and that in the absence of Congressional action their regulation is peculiarly within its competence, even though interstate commerce is materially affected. Minnesota Rate Cases [Simpson v. Shepard], 230 U.S. 352, 416 [33 S. Ct. 729, 57 L.Ed. 1511].'" 306 F.2d at 716.

We have heretofore emphasized the fact that the Commonwealth, in constructing federal aid highways, has operated solely within its borders. This is because in the absence of federal regulation, the state may regulate its own intrastate activities, notwithstanding their effect on interstate commerce. Under the law of Pennsylvania, the Commonwealth is "immune for liability in trespass for the negligence of its agents and employees in the construction, maintenance and re-

---

11. In Road Review League v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967), a conservation group challenged the determination of the Federal Highway Administrator, who approved the proposed route for a portion of the interstate highway.

12. In DeLong Corp. v. Oregon State Highway Comm'n., 233 F.Supp. 7 (D.Ore. 1964), a contractor sued the state through the state highway commission for a declaration of rights regarding the provisions of a contract for the construction of an interstate bridge.

pair of a highway." Rader v. Pennsylvania Turnpike Comm'n., 407 Pa. 609, 611, 182 A.2d 199, 200 (1962). There is no Pennsylvania statute waiving its Eleventh Amendment or sovereign immunity to a suit in trespass for negligence in the construction of either a state or interstate highway. In the absence of a statutory waiver by the state, we turn our attention to the question whether under the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq. and the Highway Safety Act, 23 U.S.C. § 401 et seq., Congress has acted in such a manner as to condition the state's entry into commerce upon its waiver of immunity and has provided a cause of action for a breach of its provisions.

### D. *The Federal Highway Statutes*

Neither the Federal-Aid Highway Act, 23 U.S.C. § 101 et seq., nor the Highway Safety Act expressly authorize a suit or cause of action for violation of their provisions. Plaintiffs argue that a cause of action is implied in that damages are necessary to effectuate the Congressional policy underlying the substantive provisions of those acts.

Plaintiffs' first claim is under the Federal-Aid Highway Act, in which several provisions are designated by plaintiffs as requiring this Court to imply a cause of action. Section 106(a) provides for the submission by the state and approval by the United States Secretary of Transportation [Secretary] of surveys, plans, specifications and estimates for each proposed project. Section 109(a) provides that the Secretary shall not approve the plans and specifications unless they are conducive to traffic needs, safety, durability and economy. Section 109(d) provides that the location of highway signs shall be subject to the approval of the State Highway Department with the concurrence of the Secretary. Section 109(e) provides that no funds shall be approved unless proper safety protective devices complying with certain safety standards approved by the Secretary are installed. Section 114(a) provides that highway construction shall be under the supervision of the State Highway Department, subject to the inspection and approval of the Secretary. Section 116(a) provides that it is the duty of the state to maintain the highways, and Section 116(c) provides that if the highway is not being properly maintained, the Secretary may withhold approval of further projects.

The statutory language of the Federal-Aid Highway Act clearly indicates that the ultimate responsibility for any safety provisions under the Act lies with the Secretary. The Secretary is given the power to withhold his approval in the event the design or construction of the highway does not meet applicable federal standards. Moreover, the Secretary is empowered to withhold funds for future projects in the event the highway is not being properly maintained. Consequently, the statutory language militates against the implication of a private remedy in that the express sanction provided in the Act is disqualification of the state for federal funds. It is noteworthy that the circumstances which would disqualify the state are in no way declared unlawful. Moreover, the congressional policy underlying the Act does not mandate an implied private cause of action. In Mahler v. United States, *supra*, the Third Circuit undertook an extensive and exhaustive review of the legislative history of the Act and concluded:

"It seems clear from the Acts of Congress and their accompanying legislative history, that grants-in-aid under the Federal Highway Program were and are designed to encourage states to construct their own highways and that the primary function of the Bureau of Public Roads, in approving plans submitted to it by a state and inspecting roads during and after construction, is that of making sure that federal appropriations are being utilized properly and efficiently by the respective states and are not being wasted." 306 F.2d at 716.

The Court then concluded in the light of the legislative history that the Act imposes no duty on the United States running to private persons. Since the purpose of the Act is the protection of federal investment, and the sanctions provided therein are directed to fulfill such purpose, we conclude that the Act imposes no duty and no liability on the state other than those specified therein and gives rise to no private cause of action.

Secondly, plaintiffs claim that a private cause of action exists under Section 402(a) of the Highway Safety Act, 23 U.S.C. § 402(a),[13] and the regulations promulgated thereunder.[14] Section 402 (a) authorizes the Secretary to establish uniform standards of performance criteria. Under the applicable standard regarding highway design, construction and maintenance, each state program shall provide standards for pavement design and construction with specific provisions for high skid resistance qualities; a resurfacing program with emphasis on roads with low skid resistance and high accident rates; and guardrailings which will minimize the severity of impact and retain the vehicle.

The purpose of the Act and its regulations is manifest on its face—highway safety. The Act, however, was initially passed in 1966, while the highway in question was originally constructed in 1958. Thus, the provisions of the Act and regulations pertaining to safety programs in the initial design and construction of a federal aid highway are inapplicable, leaving only those involving resurfacing and corrections of areas with low skid resistance and high accident rates pertinent here.

A reading of the language of the regulation indicates that the establishment of such programs is directory rather than mandatory. In order to receive federal aid under this section, the state is directed to implement such a highway safety program. 23 U.S.C. § 402(c). Without such a program, the Secretary is authorized to discontinue the apportionment of funds under the Act. Thus, the power of the federal government to cut off federal funds provides the only sanction expressly authorized under the Act. We, therefore, conclude that the Highway Safety Act creates no duty on behalf of the states running toward these plaintiffs and creates no private action for breach thereof.

### E. Conclusion

Plaintiffs argue that under the facts of this case the Commonwealth waived its Eleventh Amendment immu-

---

13. See note 4 supra.

14. Pursuant to this provision, the United States Bureau of Transportation promulgated certain uniform safety standards. 23 C.F.R. ch. 2. Those standards applicable to the instant case are set forth in Highway Safety Program Standard No. 12, which provides in pertinent part:

"HIGHWAY DESIGN, CONSTRUCTION AND MAINTENANCE

Every state in cooperation with county and local governments shall have a program of highway design, construction and maintenance to improve highway safety. Standards applicable to specific programs are those issued or endorsed by the Federal Highway Administrator.

I. The Program shall provide, as a minimum, that:

⋅ ⋅ ⋅ ⋅ ⋅

D. There are standards for pavement design and construction with specific provisions for high skid resistance qualities.

E. There is a program for resurfacing or other surface treatment with emphasis on correction of locations or sections of streets and highways with low skid resistance and high or potentially high accident rates susceptible to reduction by providing improved surfaces.

⋅ ⋅ ⋅ ⋅ ⋅

J. There are highway design and construction features wherever possible for accident prevention and survivability including at least the following:

⋅ ⋅ ⋅ ⋅ ⋅

4. Bridge railings and parapets which are designed to minimize severity of impact, to retain the vehicle, to redirect the vehicle so that it will move parallel to the roadway, and to minimize danger to traffic below."

nity and that the federal highway acts provide, by implication, a private cause of action. Plaintiffs have failed to meet their heavy burden and, in effect, have attempted to pile Pelion upon Ossa to reach Olympus. We, therefore, hold: (1) in voluntarily applying for and accepting federal funds under the Federal-Aid Highway Act and in entering into interstate commerce in the construction of interstate highways, the Commonwealth has not waived its Eleventh Amendment immunity; and (2) neither the Federal-Aid Highway Act nor the Highway Safety Act create an implied cause of action to recover damages for personal injuries sustained as a result of a violation of the standards set forth therein or regulations promulgated thereunder. Accordingly, the motion of the Commonwealth of Pennsylvania to dismiss the complaints as they are applicable to it will be granted.

## II.

In addition to the Commonwealth of Pennsylvania, the Daye complaint has named individual officers of the Pennsylvania Department of Transportation as party-defendants. Jurisdiction over these parties is based on diversity of citizenship and the alleged liability of the individual defendants is based on negligence. Thus, the issue remains as to liability of the public officers arising from their alleged nonfeasance in failing to insure proper drainage and adequate guardrails along U. S. 22 in the light of the high number of reported accidents at this precise location of the route.

We are cognizant of a substantial split of authorities among the states on the issue of tort liability of public officers,[15] and the compelling arguments both in favor of and against the immunity of public officers. We are constrained, however, under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) to apply the substantive law of Pennsylvania. In Yealy v. Fink, 43 Pa. 212 (1862), the Supreme Court of Pennsylvania first enunciated the general rule that public officers, acting within the scope of their authority, are immune from tort liability so long as their act was not malicious or so wanton and reckless as to prove it was malicious. Under that rule, the Court maintained that a mistake in judgment was not sufficient to render public officials liable in damages, and the courts were directed not to review the judgment of such officials while they act within the scope of their authority. 43 Pa. at 217. This rule was reiterated in Burton v. Fulton, 49 Pa. 151 (1865) and has been consistently applied to the present date. Waters v. Evans, 47 Pa.Dist. & Co.R.2d 419 (1969); Thomas v. Osborn, 39 Pa.Dist. & Co.R.2d 472 (1966). In Highway Paving Co. v. Hausman, 171 F.Supp. 768 (E.D.Pa.1959), the District Court construed the Pennsylvania cases as holding that:

> "[P]ublic officials acting within the scope of their authority are not answerable in damages for the consequences of their acts unless done maliciously and with intent to injure." 171 F.Supp. at 770.

Moreover, this rule has been applied not only to affirmative acts of officials, but also to their inaction or nonfeasance. Thomas v. Osborn, *supra,* 93 Pa.Dist. & Co. R.2d at 473.

The Pennsylvania courts have applied the foregoing principle to a myriad of factual situations, none of which are directly on point.[16] We are con-

---

15. *See* 40 A.L.R. 39, supplemented at 57 A.L.R. 1037. *See also* Harper & James, The Law of Torts, Vol. 2 § 29.8; Prosser, Handbook of the Law of Torts (4th Ed.) § 132.

16. The immunity of public officials has been applied to bar actions in the following instances: official's decision to construct a causeway rather than a bridge which resulted in water damage to the property of a downstream owner. Yealy v. Fink, *supra;* the dismissal of a school principal by school directors without assigning a cause therefor, Burton v. Fulton, *supra;* action by an unsuccessful bidder on a state materials contract, Highway Paving Co. v. Hausman, *supra;*

vinced, however, that the pervasive application of the rule indicates that the Pennsylvania courts would likewise apply it to the facts here involved. Since plaintiffs have not specifically alleged in their complaint malice or wanton and reckless conduct which is tantamount to malice as to the individual defendants, we conclude that they are immune from suit. Accordingly, the motion of the individual defendants to dismiss the complaint as it is applicable to them will be granted.

### III.

 Lastly, the *Daye* complaint has named the Pennsylvania Department of Transportation (Penndot) as a party-defendant. Again, jurisdiction is based on diversity of citizenship and, again, the Commonwealth raises the defense of immunity. Whether Penndot, as an agency or alter ego of the State, is immune from the tort liability posited here is a question of state law. Harris v. Pennsylvania Turnpike Comm'n., *supra*, 410 F.2d at 1334–1335. In Conrad v. Commonwealth, Department of Highways, 441 Pa. 530, 272 A.2d 470 (1971), the Supreme Court of Pennsylvania applied the doctrine of governmental immunity to bar an action in trespass for damages against the Department of Highways. In 1970, the Pennsylvania legislature transferred the powers, functions and duties of the Department of Highways to Penndot, 71 P.S. § 511. Thus, the doctrine of governmental immunity, as applied in *Conrad*, would likewise bar this present action. Furthermore, in a highly analogous situation, the Supreme Court held that the Pennsylvania Turnpike Commission, as an instrumentality of the state engaged in a governmental function, is immune from liability in trespass for damages resulting from the negligence of its agents and employees. Rader v. Pennsylvania Turnpike Comm'n., *supra*. Accordingly, the motion of Penndot to dismiss the complaint as it is applicable to them will be granted.

 Finally, plaintiffs suggest that the doctrine of governmental immunity is no longer viable and that we should re-examine it. *Conrad* demonstrates its viability as recently as 1971 and in *Harris*, the *Third Circuit* expressly refused to re-examine the doctrine as recently as 1969. We are bound by both.

---

failure to adequately inspect a public camp site, Waters v. Evans, *supra*; and

failure of police officers to protect property, Thomas v. Osborn, *supra*.