See also, D.C., 367 F.Supp. 784.

Dorothy CRASTO et al., on behalf of themselves and all other shareholders of 360 East 72nd Street Owners Incorporated, Plaintiffs,

v.

ESTATE OF Alfred L. KASKEL et al., Defendants.

Malcolm KAHN et al., on behalf of themselves and all other shareholders of 360 East 72nd Street Owners Incorporated similarly situated, Plaintiffs,

v.

Doris KASKEL et al., Defendants.

Nos. 73 Civ. 3486–LFM, 73 Civ. 4039–LFM.

United States District Court,
S. D. New York.

April 16, 1974.

Olitt, Friedberg & Kagel, New York City, for plaintiffs in 73 Civ. 3486–LFM; J. Jerome Olitt, New York City, of counsel.

Marvin J. Goldstein, New York City, for plaintiffs in 73 Civ. 4039–LFM.

Goldman, Cooperman & Levitt, New York City, for defendant 360 East 72nd Street Owners Inc.; Jack B. Levitt, New York City, of counsel.

Finley, Kumble, Heine, Underberg & Grutman, New York City, for defendants Doris Kaskel and others as Executors of the Estate of Alfred L. Kaskel; Donald A. Snider, New York City, of counsel.

Leon Brickman, Brooklyn, N. Y., for defendant Douglas Gibbons-Hollyday & Ives, Inc.

## OPINION

MacMAHON, District Judge.

Plaintiffs, in these related class actions under the New York state and federal securities laws, move, pursuant to Rule 23(c)(1), Fed.R.Civ.P., and Rule 11A(c) of this court, for class action determination.

The underlying facts in these controversies may be found in our earlier decisions of motions in these cases, dated December 12, 1973[1] and January 22, 1974, and in the opinion of the New York Court of Appeals in Richards v. Kaskel, 32 N.Y.2d 524, 347 N.Y.S.2d 1, 300 N.E.2d 388 (1973). We will therefore, discuss here only those facts relevant to this motion.

Plaintiffs are shareholders in 360 East 72nd Street Owners Incorporated (Corporation), a co-operative apartment building located in Manhattan. They sue on behalf of the class of all persons who have, at any time, purchased, held, or been allocated, shares in the Corporation, alleging violations of §§ 5, 12, 15, 16, 17(a) and 22 of the Securities Act of 1933, 15 U.S.C. §§ 77e, 77l, 77o, 77p, 77q(a) and 77v; § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C § 78j(b); §§ 352–c, 352–e and 359–ff of the New York General Business Law (McKinney's Consol.Laws, c. 20 1968); and the common law. The complaints differ only in the relief sought. Plaintiffs seek damages in *Crasto* and rescission in *Kahn*.

The complaints allege that defendants, including the Estate of Alfred Kaskel, the sponsor of the co-operative plan (Sponsor), among other representations, made oral and written misrepresentations to the class members to the effect that (1) the co-operative plan would be offered only to New York state residents; (2) the plan would not become effective until 35% of the tenants resident in the building had purchased shares in the Corporation; (3) the requisite 35% was lawfully obtained by the Sponsor; (4) no claims or lawsuits were threatened or pending against the Sponsor or its agent in connection with the plan; (5) federal and New York state income tax deductions would be available to the shareholders; and (6) the plan, if declared effective, would enable the Corporation to evict the building's tenants, who otherwise would be protected from eviction by the New York City Rent Stabilization Law of 1969.

Plaintiffs claim that these misrepresentations were made orally and in writing in a number of ways, at varying times, specifically, in the "Offering Plan and Statement of Cooperative Organization" (Offering Plan), issued by the Sponsor on October 31, 1969, the eight subsequent amendments to the Offering Plan issued over a three and one-half year period,[2] additional selling materials, press releases and written announcements.

The parties differ in their estimates of the number of members of the class. Plaintiffs claim that the number of class members is approximately 350, but the records of the Sponsor, which plaintiffs concede are the most accurate source of

---

1. Kahn v. Kaskel, 367 F.Supp. 784 (S.D.N.Y.1973).

2. The dates of the amendments are:

| First Amendment | May 22, 1970 |
| Second Amendment | August 4, 1970 |
| Third Amendment | March 22, 1971 |
| Fourth Amendment | May 4, 1971 |
| Fifth Amendment | July 23, 1971 |
| Sixth Amendment | March 3, 1972 |
| Seventh Amendment | June 17, 1973 |
| Eighth Amendment | July 19, 1973 |

this information, reveal that there are 298 persons who have purchased, held, or been allocated, shares in the Corporation. At present, there are 232 shareholders, most of whom currently reside at 360 East 72nd Street.

On January 18, 1974, the Sponsor issued settlement proposals to the members of the class. Plaintiffs then sought an order temporarily and permanently enjoining defendants from distributing the proposals, but the court, after granting temporary relief, denied plaintiffs' application for permanent injunctive relief and vacated the temporary restraining order on January 22, 1974. It now appears that 151 class members have accepted, or intend to accept, the Sponsor's proposals and will, in accordance with the terms of the settlements, request exclusion from these actions should they be declared class actions. Thus, the class now contains 147 potential plaintiffs.[3]

If plaintiffs can satisfy the requirements of Rule 23(a) and (b), the motion for class action determination should be granted.[4] However, since we hold that these actions cannot properly be brought under any of the subsections of Rule 23(b), we need not discuss whether plaintiffs satisfy the requirements of Rule 23(a).

Plaintiffs appear to concede, as they must, that their actions cannot be brought under Rule 23(b)(2), which is applicable only to actions for declaratory or injunctive relief. They claim, however, that under either (b)(1) or (b)(3) of the rule, these actions should be granted class status.

An action may be brought as a class action under Rule 23(b)(1) if individual adjudication of the controversy would prejudice either the party opposing the class, (b)(1)(A), or the class members themselves, (b)(1)(B).[5] Here, a disposition of the actions on an individual basis will neither prejudice the defendants nor the members of the class. At worst, defendants will have to pay damages or grant rescission to some plaintiffs but not to others, a course of conduct outside the scope of (b)(1)(A).[6] Moreover, we can conceive of no possible prejudice to the class members from individual adjudications which will bind only the parties to those actions. Numerous courts have held that class actions under the securities laws are not appropriate for class action treatment under (b)(1).[7] We conclude, therefore,

---

3. Defendants claim that the number of class members is not "so numerous that joinder of all members is impracticable." Rule 23(a)(1), Fed.R.Civ.P. Since we find that the actions fail to meet the requirements of Rule 23(b), we need not decide this issue.

4. Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968), cert. denied, 395 U.S. 977, 89 S. Ct. 2131, 23 L.Ed.2d 766 (1969); Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968).

5. Rule 23(b)(1), Fed.R.Civ.P., provides:
"(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
(1) the prosecution of separate actions by or against individual members of the class would create a risk of
(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. . . . "

6. See, Rule 23: Categories of Subsection (b), 10 B.C.Ind. & Com.L.Rev. 539, 540 (1969).

7. Berley v. Dreyfus & Co., 43 F.R.D. 397 (S.D.N.Y.1967); Berger v. Purolator Pdts., Inc., 41 F.R.D. 542 (S.D.N.Y.1966); Contract Buyers League v. F & F Investment, 48 F.R.D. 7, 14 (N.D.Ill.1969); Zeigler v. Gibraltar Life Ins. Co. of America, 43 F.R.D. 169 (D.S.D.1967); Bragalini v. Biblowitz, 13 Fed.R.Serv.2d 635 (S.D.N.Y.1969); Burstein v. Slote, 12 Fed.R.Serv.2d 577 (S.D.N.Y.1968).

that these actions may not be maintained as class actions under Rule 23(b)(1).

Most class actions brought under the securities laws invoke subsection (b)(3),[8] and plaintiffs argue that subsection (b)(3) is most appropriate here. Before plaintiffs can qualify for class status under (b)(3), however, the court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

## PREDOMINANCE

Plaintiffs argue that the issues of fact respecting fraud and misrepresentation are common to the class and predominate over any individual issue, including reliance and damages. Our function here is to determine whether the class is "more bound together by a mutual interest in the settlement of common questions than it is divided by the individual members' interest in the matters peculiar to them."[9]

■ There can be no question that a securities fraud, perpetrated on a large group of persons by similar or identical misrepresentations, is appropriate for class treatment.[10] "On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed."[11] This is especially true where the alleged misrepresentations include oral statements to some or all members of the class, which must, of necessity, differ from person to person.[12]

It appears that the misrepresentations allegedly made by defendants here varied materially among the members of the class, and, therefore, that the issue of misrepresentation must be considered not as a common question but as many individual issues. Our conclusion is based on the variety of documents which plaintiffs claim contained misrepresentations and on the fact that many oral representations were made in this case.

The written material issued by defendants is considerable and varied, both in its representation of facts and in the legal conclusions to be drawn from them. Defendants issued eight amendments to the original Offering Plan over a three and one-half year period. Each amendment changed the plan or varied the representations made by defendants in material ways.

For example, the potential tax deduction for shareholders is discussed in the Offering Plan and in the fifth and sixth amendments to the plan. Each of these documents contains an opinion of counsel which differs materially from the others in its estimation of the probability that a tax deduction would be available to the shareholders. Similarly, although the Offering Plan and the first through fourth amendments to it do not mention any pending or possible litigation, the fifth, sixth, seventh, and eighth amendments to the plan discuss the vari-

8. See, Bragalini v. Biblowitz, *supra*, 13 Fed. R.Serv.2d at 639.

9. 3B J. Moore, Federal Practice ¶ 23.45 [2] at 23–751 (2d ed. 1974).

10. Green v. Wolf Corp., *supra*, 406 F.2d at 301; Advisory Committee Report on the Proposed Amendments to the Rules of Civil Procedure, 39 F.R.D. 73, 103 (1966).

11. Advisory Committee Report, *supra*, 39 F. R.D. at 103; Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 482 F.2d 880, 882 (5th Cir. 1973); Winokur v. Bell Federal Savings & Loan Ass'n, 58 F.R.D. 178 (N.D. Ill.1972); cf. Kronenberg v. Hotel Governor Clinton, Inc., 41 F.R.D. 42, 45 (S.D.N.Y. 1966).

12. Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc., *supra*, 482 F.2d at 882; Morris v. Burchard, 51 F.R.D. 530 (S.D.N.Y.1971); Goldstein v. Regal Crest, Inc., 59 F.R.D. 396 (E.D.Pa.1973); 6 L. Loss, Securities Regulation 3947 (2d ed. Supp. 1969).

ous stages of the *Richards* litigation in detail. This process of updating events which affected the plan continues throughout the written material.

Thus, the written representations are by no means uniform. At best, they form a series of nine different and distinguishable (although related) sets of representations upon which nine different groups of shareholders relied during nine different time periods.

Thus, we will be required to decide, as to each document, whether it was misleading at the time it was issued. Unlike the common securities fraud case, in which a series of documents repeat identical or similar misrepresentations, here, each group of purchasers was relying on a materially different set of documents. When we include the alleged press releases, selling materials and written announcements, which may or may not have reached all the members of the class, the picture becomes even more jumbled and varied. Thus, it seems clear that the alleged misrepresentations are not common to the class even as to the written materials issued by defendants.

■ The variations in the written material might be remedied by the creation of subclasses, pursuant to Rule 23(c)(4), each subclass containing persons who purchased during similar time periods and who relied on similar representations. Subclasses cannot solve the problem of material variation in these cases, however, because plaintiffs' actions rest in part, at least, on oral misrepresentations. Plaintiffs' reply affidavit quotes extensively from the named plaintiffs' answers to the Sponsor's interrogatories,[13] which state that numerous oral representations were made to them concerning the *Richards* case. Thus, it would appear that plaintiffs will rely heavily on the oral representa-

tions allegedly made by various defendants. Moreover, it appears that a substantial portion of the class members purchased in reliance on defendants' oral representation during the "all-out" period of November 11–12, 1969 that the required 35% had been collected. It was this action by defendants that gave rise to the non-purchasing tenants' suit in *Richards*. See 24 N.Y.2d at 532, 347 N.Y.S.2d 1, 300 N.E.2d 388.

Oral representations, by their very nature, differ from person to person, especially where, as here, they are made by and to different people.[14] Thus, at trial, in order to prove that the representations were made, plaintiffs would be required to call each class member who was allegedly deceived by oral representations.[15] We conclude, therefore, that the question of misrepresentation here is an individual, not a common question.

■ The question of reliance, or causation, also raises serious problems. Although the issues of reliance and damages can await a prior and separate trial of the common issues in a class action,[16] the very nature of the transactions involved here complicates the problem.

■ This is no ordinary securities class action. Technically the rights to occupancy in the apartments at 360 East 72nd Street are securities because they were sold as shares in a corporation. Plaintiffs, therefore, do have claims under the New York and federal securities laws. The commodity actually sold in those transactions, however, was a place to live, a home. This is apparent from *Richards*, where the Court of Appeals found that many people had bought shares because they feared eviction from their homes. 24 N.Y.2d at 539, 347 N.Y.S.2d 1, 300 N.E.2d 388. The real nature of the transaction appears as well from the Offering Plan, which outlines

---

13. Olitt reply affidavit, pp. 13–18.

14. Goldstein v. Regal Crest, Inc., *supra*, 59 F.R.D. at 402; Moscarelli v. Stamm, 288 F. Supp. 453 (E.D.N.Y.1968).

15. Morris v. Burchard, *supra*, 51 F.R.D. at 534.

16. Green v. Wolf Corp., *supra*, 406 F.2d at 301; Cutner v. Fried, 373 F.Supp. 4, 73 Civ. 227–LFM (S.D.N.Y. Mar. 13, 1974).

in detail the various advantages of life at 360 East 72nd Street.

Thus, the decision of each class member to buy shares was a highly individualized, personal one. Misrepresentations made by defendants undoubtedly played a part in those decisions, but so did individual factors peculiar to each class member.[17] Thus, the question of reliance here is one of greater complexity and difficulty than in most class actions where reliance is a simple matter of showing a causative connection between defendant's fraud and plaintiff's loss. Here, many separate trials of some length on the issue of reliance would undoubtedly be necessary and would place a considerable burden on the court's time and resources.

We conclude, therefore, that the individual issues of misrepresentation, reliance and damages predominate over the common issues, if any, in these actions.

### SUPERIORITY

We have also determined that a class action is not superior to other available methods of adjudicating these controversies.[18] This is primarily because we believe that the members of the class have a strong interest in individually controlling the prosecution of their claims.[19]

As previously discussed, this is not the typical securities action in which no more than a person's investment in a corporation's stock is at stake. Here, most, if not all, of the class members bought a home. The basic interest of all the class members is not necessarily in recovering their investments or damages. We cannot say that the ends sought or the strategy adopted by the class representatives will be shared by all members of the class whose individual monetary interests may be transcended by other considerations. Since all members of the class who do not request exclusion will be bound by the judgment, important individual interests may be lost if these actions proceed on a class basis.[20] Thus, some class members may prefer not to litigate at all but to attempt to reach an amicable agreement with defendants, which will guarantee the security of their homes while making recompense for any wrongs they have suffered. Others may wish to move out of the building, sell their shares and attempt to collect damages from defendants.

Where the claims involved "vitally affect a significant aspect of the lives of the claimants . . . [and] there is a wide range of choice of the strategy and tactics" in the litigation, the court is justified in finding that each class member has a legitimate interest in individually litigating his claim.[21] Here, since the claims, in many cases, involve the purchase of homes, a significant aspect of the class members' lives is vitally affected. Moreover, the possible strate-

---

17. Moscarelli v. Stamm, *supra*, 288 F.Supp. at 462–463.

18. The Court of Appeals, in Green v. Wolf Corp., *supra*, 406 F.2d at 301, described "superiority" as "the most important requirement to be met before" a suit can be allowed to proceed as a class action under (b)(3).

19. Rule 23(b)(3)(A), Fed.R.Civ.P.

20. Rule 23(c)(2)(B), Fed.R.Civ.P.

21. Hobbs v. Northeast Airlines, Inc., 50 F. R.D. 76, 79 (E.D.Pa.1970) ; Daye v. Commonwealth of Pennsylvania, 344 F.Supp. 1337, 1343 (E.D.Pa.1972) ; Buford v.

American Finance Co., 333 F.Supp. 1243, 1249–1250 (N.D.Ga.1971) ; 3B J. Moore, *supra* (Supp.1973) ¶ 23.45 [4–2]–(A), at 84.

"Even though the interests of the individual is only one of the four factors which are to be considered, a strong interest among the members in conducting separate suits could cause a denial of the class action. The predominance of common issues and the superiority of the class action are directly related to members' individual interests. As the issues affecting individuals increase, the desirability of conducting separate suits will also increase. The result is a lack of a predominance of common issues and a concomitant lack of superiority in the class action." 10 B.C.Ind. & Com.L.Rev., *supra*, at 547.

gies the class members might adopt vary greatly.

The class members' strong interest in controlling their own destiny in this litigation is evidenced by the large numbers of non-party class members who have already agreed to settle their claims with defendants and appear likely to opt out.

In addition, there appears to be no question that the class members have both the resources and the inclination to vindicate their rights on an individual basis. The apartments involved were luxury units, located in one of the most fashionable areas of New York City, and the class members' initial investments ranged from $11,000 to $85,000 with yearly maintenance charges of $1,370 to $10,000. The issues raised by these actions have been discussed at length by the shareholders at meetings of the Corporation, amid some bickering and bitterness among the members of the class. Thus, the shareholders are well aware of their rights and have sufficient resources to retain counsel and litigate themselves. The presence of strong disagreement within the class is yet another reason why these actions should proceed on an individual basis.

Finally, this is not a case in which the damage suffered by each class member is too small to justify individual action, thereby making a class action the only means available for vindicating the claims of the class.[22] On the contrary, here, each shareholder's claim, whether for rescission or damages, is for a substantial amount of money and more than sufficient to enable him to bring his own action.[23]

We find, therefore, that a class action is not superior to other means available for adjudicating these controversies, *i. e.,* individual actions by the class members. The resources of the court can best be utilized by employing the liberal provisions in the Federal Rules of Civil Procedure for multi-party litigation, including permissive joinder, intervention and consolidation.[24]

Accordingly, we conclude that these actions may not proceed as class actions under Rule 23(b)(3) or any of the other subsections of Rule 23(b). Plaintiffs' motion for class action determination is therefore denied. Since it appears that these actions are identical, except for the relief sought, the parties are directed to submit an order, pursuant to Rule 42(a), Fed.R.Civ.P., consolidating these actions.

Settle order on notice within ten (10) days.

22. *E. g.,* Green v. Wolf Corp., *supra,* 406 F. 2d at 291.

23. Caceres v. International Air Transp. Ass'n, 46 F.R.D. 89, 95 (S.D.N.Y.1969).

24. See Rules 20, 24 and 42(a), Fed.R.Civ.P.