Emmy AUSTIN and William L. Austin, Sr., As Next of Kin of William L. Austin, Jr., Deceased, Plaintiffs–Appellees,

v.

STATE of Tennessee, Defendant–Appellant.

Supreme Court of Tennessee, at Jackson.

July 30, 1990.

Philip E. Mischke, McDonnell, Boyd, Smith & Solmson, Memphis, for plaintiffs-appellees.

Charles W. Burson, Atty. Gen. & Reporter, Kevin Steiling, Asst. Atty. Gen., Nashville, for defendant-appellant.

## OPINION

FONES, Justice.

This claim against the State of Tennessee is for the wrongful death of William L. Austin, Jr. The trial judge granted plaintiff's motion for summary judgment and awarded the maximum recovery against the State of $300,000. The Court of Appeals affirmed the trial court on the issue of jurisdiction, pursuant to T.C.A. § 9–8–307(a)(1)(I), but held that summary judgment on the issue of negligence was inappropriate and remanded for trial on the merits of that issue.

The underlying facts of this action are addressed in *Austin v. City of Memphis*, 684 S.W.2d 624, 626 (Tenn.Ct.App.1984).

On the night of March 16, 1980, during a period of heavy rains, plaintiffs' decedent was driving his automobile in a northerly direction on Perkins Street in

Memphis, Tennessee. He was in the process of traversing the four-lane concrete Perkins Street Bridge over Nonconnah Creek when a part of the bridge on the eastern-most, or upstream side, collapsed. His vehicle fell into the Nonconnah Creek and his death resulted.

In 1981 plaintiffs, decedent's parents, filed this claim against the State in the Tennessee Board of Claims. As the Court of Appeals noted, the claim asserts that "the State had a duty to inspect and maintain the Perkins Road Bridge, that it negligently failed to perform this duty, and that this negligence was a proximate cause of the bridge collapse and resulting death of plaintiff's decedent." In 1986 the action was transferred to the Tennessee Claims Commission by agreement of the parties, and in 1987 it was transferred to the Shelby County Chancery Court. Finally, the case was transferred to the Shelby County Circuit Court and consolidated with the case cited above against the City of Memphis and others. After plaintiffs were awarded judgment against the State in the trial court, they dismissed with prejudice their action against the City of Memphis and the other defendants.

The legislature has abrogated the State's sovereign immunity to the extent that it has granted jurisdiction to the Tennessee Board of Claims. The grant of jurisdiction relevant to this case reads as follows:

The commission or each commissioner sitting individually shall have exclusive jurisdiction to determine all monetary claims against the state falling within one (1) or more of the following categories:

. . . . .

(I) Negligence in planning and programming, inspection, design, construction, maintenance or approval of plans and construction of public highways and bridges *if such activity is mandated or undertaken pursuant to state or federal law.*

T.C.A. § 9–8–307(a)(1) (emphasis added). The State's position in the courts below and here is that the Board of Claims had no jurisdiction over this claim because the State's involvement with the Perkins Road Bridge was not "mandated or undertaken pursuant to state or federal law." The trial court and the Court of Appeals held that the State was required to maintain the bridge pursuant to federal law.

## I.

We will first consider whether federal law mandated that the State inspect or maintain the Perkins Road Bridge, or whether the State did undertake the inspection or maintenance of that bridge.

The Federal Aid Highways Act, 23 U.S.C. § 101, *et seq.,* established four systems: the Primary System, the Secondary System, the Urban System and the Interstate System. 23 U.S.C. § 103. It is undisputed that the Perkins Road Bridge was designated a part of the Secondary System in 1956 as route 8180 and redesignated as part of the Urban System in 1975 as route 2814.

Congress declared that the most important objective of the Act was to complete the Interstate System, but also added the following paragraphs with respect to the purpose of the other three federal-aid systems:

(b) It is hereby declared to be in the national interest to accelerate the construction of the Federal-aid highway systems, including the National System of Interstate and Defense Highways, since many of such highways, or portions thereof, are in fact inadequate to meet the needs of local and interstate commerce, for the national and civil defense.

. . . . .

It is further declared that since the Interstate System is now in the final phase of completion it shall be the national policy that increased emphasis be placed on the construction and reconstruction of the other Federal-aid systems in accordance with the first paragraph of this subsection, in order to bring all of the Federal-aid systems up to standards and to increase the safety of these systems to the maximum extent.

23 U.S.C. § 101(b).

In 1970 Congress established the Highway Bridge Replacement and Rehabilita-

tion Program, by an amendment to the Federal Aid Highways Act. 23 U.S.C. § 144. That amendment imposed specific duties upon the Secretary of Transportation and the States. Subsections (a), (b) and (d) of that amendment read as follows:

(a) Congress hereby finds and declares it to be in the vital interest of the Nation that a highway bridge replacement and rehabilitation program be established to enable the several States to replace or rehabilitate highway bridges over waterways, other topographical barriers, other highways, or railroads when the States and the Secretary finds [sic] that a bridge is significantly important and is unsafe because of structural deficiencies, physical deterioration, or functional obsolescence.

(b) The Secretary, in consultation with the States, shall (1) inventory all those highway bridges on any Federal-aid system which are bridges over waterways, other topographical barriers, other highways, and railroads; (2) classify them according to serviceability, safety, and essentiality for public use; (3) based on that classification, assign each a priority for replacement or rehabilitation; and (4) determine the cost of replacing each such bridge with a comparable facility or of rehabilitating such bridge.

.    .    .    .    .

(d) Whenever any State or States make application to the Secretary for assistance in replacing or rehabilitating a highway bridge which the priority system established under subsection (b) and (c) of this section shows to be eligible, the Secretary may approve Federal participation in replacing such bridge with a comparable facility or in rehabilitating such bridge. The Secretary shall determine the eligibility of highway bridges for replacement or rehabilitation for each State based upon the unsafe highway bridges in such State. In approving projects under this section, the Secretary shall give consideration to those projects which will remove from service those highway bridges most in danger of failure.

The record reflects the efforts of the Tennessee Department of Transportation (TDT) to comply with 23 U.S.C. § 144 and specifically its actions with regard to the Perkins Road Bridge. Tennessee established a state-wide program for the inspection of the bridges in the federal-aid systems and informed counties and municipalities where such bridges were located and that the State would be inspecting the bridges and charging for that service. Shelby County made a request of the federal authorities to perform the inspection of bridges located in the county. Shelby County received a response dated 26 November 1973 which read in part as follows:

The inspection and report must be acceptable to the State Highway Department since they have the responsibility of collecting all data for the State and organizing such data in report form.

Assuming Shelby County has the capability of inspecting their bridges in accordance with the NBIS, the FHWA will accept their inspection if such inspections are acceptable to the Tennessee Department of Transportation.

Shelby County satisfied the TDT that it had competent and qualified bridge inspectors. The TDT agreed to permit the county to perform the inspections and report to the Structures Division for transmittal to the Federal Highway Administration to comply with the State's obligations pursuant to 23 U.S.C. § 144 and applicable regulations.

In June 1977 Shelby County notified the City of Memphis that it would no longer inspect bridges on the federal-aid systems that were within the City of Memphis and sent a copy of its letter notice to the appropriate TDT officials. The county's letter contained the following advice:

Congress passed a law requiring an inspection on a periodic basis of all bridges on the federal-aid system. The U.S. Department of Transportation has established a regulation as to how, when and by whom such inspections are to be made. The primary responsibility for these inspections in Tennessee rests with the Tennessee Department of Transpor-

tation, Bureau of Highways, which has the authority to delegate this work under certain conditions.

The county's letter also advised the city of its arrangement with the TDT to inspect bridges under the federal program and suggested the city make a similar arrangement. Presumably that was done, but the city never submitted an inspection report to the TDT during the period from June 1977 until the bridge collapsed 16 March 1980. From 1972 until October of 1978, Henry Derthick was Engineer of Structures, the highest official in the Structures Division of the TDT. From 1972 until 1978, Clellon Loveall was Assistant Engineer of Structures under Derthick and became Engineer of Structures when Derthick moved on to another position. As one would expect, the Division of Structures of the TDT was responsible to the federal authorities for compliance with inspection and reporting on the condition of bridges in Tennessee, in accord with 23 U.S.C. § 144 and the Regulations issued thereunder.

Loveall and Derthick acknowledged the responsibility of their division for the federal authorities and of the consequences of the failure to comply. Derthick testified as follows:

A. ... Should we have had a report to comply with the federal report system, the answer is yes. The punishment for not receiving those reports is a withholding of federal funds. No federal funds were withheld, therefore, we had no check on us to see that we weren't complying.

What I am—

Q. Under the federal—I am sorry, I cut you off. I apologize for that.

A. What I am saying is there are a lot of bridges.

Q. I understand there are a lot of bridges.

A. There are checks in the system but it must not have worked here.

Q. All right. Where was the check in the reporting process? Where was the State's check to see that it was receiving the reports, inspection reports required by the Federal Government? Whose department was it?

A. The inspection responsibility was with the State maintenance forces there. It was their responsibility to turn in the inspection reports. It was the Division of Structures responsibility to evaluate it.

Q. Is it your testimony that you only—

A. Evaluate the reports that come in.

Q. And you kept no record of when it last—Your division kept no record of when it last had received a report?

A. It failed to recognize that the Perkins Road Bridge had missed its cycle in 1978.

Q. And the information that moved to the Federal Government came out of the Structures Department, is that correct?

A. That is correct.

.    .    .    .    .

Q. All right, sir. Did you hear the testimony earlier by Mr. Loveall that there was not any inspections that he had in his file from 1976 forward, I believe his testimony was?

A. I heard him testify that the files were silent as far as formal inspection reports were concerned.

Q. Do you agree with his testimony earlier that his recollection was that there was a requirement to have an inspection every two years as a Federal Aid System?

A. Well, we were required to report to the Federal Highway Administration on a two year frequency the data concerning the bridge.

Now, the situation basically was this. When this program was initiated by the Federal Highway Administration as a condition of eligibility to participate in the Federal Aid Program, there was the usual start up time, and, as I recall, the first inspection requirement, the first reporting requirement may not have been until 1973. I cannot state that factually. I just recall that that may be. We had a lot of bridges to get to. I think I will stop right there and see how I did.

Mr. Loveall testified, in part, as follows:

Commencing somewhere around 1970, the State of Tennessee commenced inspecting bridges for collecting data for transmission to Washington as part of the appropriate Federal Highway Act at the time. And the general requirement was that information be transmitted to Washington on all bridges located on Federal Aid Systems.

.  .  .  .  .

A. And periodically, I believe on a yearly basis, the Federal Highway Administration asked Tennessee to transmit them a tape containing data on all the bridges under this particular program.

Q. By tape, what do you mean by tape?

A. Computer tape. I believe it is called a magnetic tape for introduction of data into a computer system.

Q. Under your section or Mr. Akins' section or who?

A. This tape is prepared by our data processing people in cooperation with people in my division.

Q. Okay. What all is contained on this magnetic tape?

A. The general characteristics of a bridge, length, width, date it was constructed, how much live load it will carry, just about anything as far as the physical description of a bridge. It is not a bridge inspection report.

A. Okay.

A. It is a—

Q. That was my next question. Is there any actual inspection, field inspections that goes into the preparation of this magnetic tape or how is it prepared?

A. Well, the magnetic tape reflects the existing conditions of each given bridge. And it reflects the results of a bridge evaluation, which is performed from the inspection data that is collected in the field.

Q. Realizing late 1975 or 1976 was before your involvement in this matter or your tenure, but based upon your review of the State's documents, were such tapes transmitted yearly by the State to Washington relative to Perkins Bridge?

A. Yes. It would have been necessary for the State of Tennessee to participate in the federal funded program.

Under the date of 5 January 1976 Shelby County Bridge inspectors J. Green, G. McDaniel, H. Shannon and F. Thomas prepared a field inspection report on the Perkins Road Bridge over Nonconnah Creek on a form entitled:

TENNESSEE BRIDGE
INSPECTION PROGRAM

DIVISION OF STRUCTURES

TENNESSEE DEPARTMENT OF
TRANSPORTATION

J.M. Akin, an engineer employed by the Division of Structures, TDT, stationed in the Jackson, Tennessee office of TDT, signed the report as "Supervising Bridge Inspector." The report shows the dimensions of the structure, the roadways, walkways, etc., the year of construction, number of spans, etc., and implicitly all of the information required by 23 U.S.C. § 144 and regulations, including 28 photographs of the bridge. The "General Comments and Recommendations" section reads as follows:

Bridge Poor. The failure of 2 piles and section of cap on Bent 3 should be corrected.

Level approaches.

Level deck @ exp. Its clear and paint all bearing devices and diaphragms.

Under the date of 4 May 1976 Mr. Derthick sent a communication to the regional office of TDT in Jackson containing the following comments and recommendations:

Field inspections have been made by our office to assist in making recommendations for the repair of the Perkins Road Bridge and related channel modifications. As noted in the bridge inspection report, dated January 5, 1976, bent No. 3 has failed due to loss of pile penetration. The channel has degraded at this location due in whole or in part to the large excavated area downstream.

In addition to Bent No. 3, bents 2, 4, and 5 will need immediate structural repairs

to prevent a possible failure during the next flood. . . .

It is further recommended that a channel stabilization structure of rip rap or sheet piling be constructed at the head of the excavated section to prevent any further profile degradation. We would urge the City to take appropriate action in this case and in further developments along Nonconnah Creek, to include these channel structures as a part of the proposed plans.

This communication was made available to the appropriate officials of Shelby County and the City of Memphis. It is clear that nothing effective was done to stabilize the channel of Nonconnah Creek. The record is obscure as to what, if anything, was done to carry out Mr. Derthick's recommendations. It is also clear that the TDT made no effort whatsoever to determine whether the local governments were carrying out those recommendations or doing anything to make the bridge safe until after its collapse, at which time they sprang into action and began performing their responsibilities. Mr. Derthick's observation was correct, and the checks in the system did not work in the case of the Perkins Road Bridge.

However, Mr. Loveall testified that TDT continued to report to the Federal Highway Administration as required by federal law. Mr. Loveall was asked what the State was reporting to Washington about the condition of the Perkins Road Bridge and his answer was as follows:

A. ... The information that was obtained, I presume, from the 1976 report would have remained intact on the date files.

.  .  .  .  .

Q. But you have nothing in your file one way or another to report to Washington as to whether it has changed in those intervening years.

A. In my review of the files, I did not see anything.

Webster's *Third New International Dictionary, Unabridged* (1971) defines "mandate", in part, as follows:

3a: An authoritative command order, or injunction; a clear instruction, authorization, or direction (acting under the mandate of the statute in question).

In 23 U.S.C. § 144, Congress used the mandatory word "shall" in imposing the duties of inventory, inspection and classification of bridges upon the Secretary of Transportation and the states. If Congress had intended that the states' responsibilities in that program be deferred until federal funds were expended on a bridge, as the State contends, it would have said so, but it did not. This record shows, without dispute, that Tennessee through its agency, TDT, Division of Structures, set up a procedure for compliance with that law, and did undertake to comply with the law from approximately 1970 forward to the date of the bridge collapse. The two men in charge of Tennessee's participation in the federal highway bridge replacement and rehabilitation program recognized that the federal law required compliance or the loss of all federal-aid to any highway systems in this State and that the Perkins Road Bridge was included in that program. It would be difficult to find a more apt example of a mandatory statute than the one under consideration.

We hold that federal law mandated that the State of Tennessee inspect and maintain the Perkins Road Bridge.

The State contends that the State did nothing with respect to the Perkins Road Bridge, that it was "owned" by Shelby County first and then the City of Memphis, and those entities performed all inspections and maintenance. We have quoted above the authorization of the federal authorities given to Shelby County to perform the State's duty of inspection, provided the county possessed the "capability of inspecting their bridges in accordance" with federal standards and their inspection and reports "must be acceptable to the State Highway Department." That response was consistent with and authorized by a regulation of the Federal Highway Administration Department of Transportation that provides that the state may delegate its responsibilities to any adequately

equipped county, municipality or other governmental instrumentality, by formal agreement, but such agreement shall not relieve the state of its responsibility. In addition, the State's contention is factually incorrect. The only inspection report submitted during the period that Shelby County was permitted to use its bridge inspection team shows on its face that J.M. Akins, an engineer employee of TDT, was the "Supervising Bridge Inspector." Also, Mr. Derthick's letter of 4 May 1976 stated that "field inspections have been made by our office." Finally, since the state is not relieved of its responsibility under federal law upon delegation of part of its duties to local government, it remains as the entity mandated to inspect and maintain bridges in the Federal Aid Highway Systems.

The State contends that the Federal–Aid Highways Act has no application to the Perkins Road Bridge because no federal funds were appropriated or expended for the construction or repair of the bridge. None of the cases cited by the State or that we have found have considered the issue of whether federal funds must be expended before a state highway department is required to comply with any of the sections requiring inspection and maintenance of roads and bridges. The cases involved environmental, condemnation and other peripheral matters having no relevance to the issue in the case at bar. In addition, the better reasoned cases hold that federal funding is not dispositive of the question of whether the act is applicable. The Court of Appeals cited and relied upon two of those cases in rejecting the State's argument: *River v. Richmond Metropolitan Authority*, 359 F.Supp. 611 (E.D.Va.), *aff'd* 481 F.2d 1280 (1973) and *LaRaza Unida v. Volpe*, 488 F.2d 559 (9th Cir.1973), *cert. denied* 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974).

The action of the Division of Structures TDT directly contradicts the State's argument that the act does not apply to the Perkins Road Bridge. They responded to the mandate of the federal law and included the Perkins Road Bridge in their reports to the Federal Highway Administration.

We find the State's contention with respect to federal funding to be without merit.

While we are of the opinion that the mandates of 23 U.S.C. § 144 and relevant regulations of the Federal–Aid Highway Act are the most direct and relevant federal statutes imposing the duties of inspection and maintenance on the states, we agree with the Court of Appeals that 23 U.S.C. §§ 114 and 116 also impose mandatory duties upon all of the states, applicable to all of the highways and bridges included in the four federal-aid systems.

It is implicit in 23 U.S.C. § 144 that the duties to inventory, inspect and classify include the duty to maintain. Whether or not federal funding is applied for or is available when applied for, it is implicit throughout the Federal–Aid Highway Act that the potential for federal funding on any part of a state's highway system is dependent upon the state's performance of the inspection and maintenance responsibilities in accord with the Act and with proper regard for the safety of the public. In short, every bridge in the federal-aid systems that is in need of rehabilitation or replacement is a project for which federal funding *might* become available.

## II.

We find that the Court of Appeals was in error in reversing the trial judge's grant of plaintiff's motion for summary judgment on the issue of proximate negligence.

The ultimate responsibility for the inspection and maintenance of the Perkins Road Bridge was upon the Tennessee Department of Transportation under both federal and state law.

Chapter 6 of Title 54, codified as 54–6–101, *et seq.*, was repealed in 1983 and replaced by chapter 4, part 4 of Title 54, codified as 54–4–401, *et seq.* However, 54–6–101, *et seq.* entitled, "Rural Roads System" was in effect from 1955 until 1983, and thus was the law throughout the time period relevant to this controversy. T.C.A. § 54–6–107 reads, in part, as follows:

The maintenance of any road hereinafter designated as a rural road eligible

for improvement under this chapter and any road heretofore constructed under the provisions of chapter 16 of the Public Acts of 1949, or as thereafter incorporated in §§ 3249.1–3249.6 of the Tennessee Code Supplement of 1950 and in §§ 54–601—54–606 of the Tennessee Code enacted in 1955 which said road or sections thereof are located within the corporate limits of towns and cities shall be the responsibility of the town or city in which same is located. In case of failure of the town or city to maintain the same in accordance with reasonable standards established by said rural roads division of the bureau of highways, the latter may take over the said maintenance and charge the cost thereof to funds in its hands or thereafter coming into its hands and allocable to the town or city under part 2 of chapter 4 of this title.

The State argues that it was not mandated to maintain the bridge since the statute uses the term "may" and not "shall."

When construing statutory language the fundamental rule is to follow the legislative intent, which is reflected in the entire code section. *Williams v. N.W. Ry. Co.*, 129 Tenn. 680, 688, 168 S.W. 160 (1914). The *Williams* court held, "[T]he word 'may' will not be construed to mean, 'shall,' where such a construction would tend to defeat the objects and purposes of the legislation, although 'may' will be construed to mean 'shall,' if such a construction is necessary to uphold, and effectuate the purpose of the act." 129 Tenn. at 689, 168 S.W. 160. After studying T.C.A. §§ 54–6–101 *et seq.*, we conclude that the State was mandated to take action if the local government was not properly maintaining the rural road. Any other interpretation would defeat the objects and intentions of the legislature. It is clear that the legislature intended that the rural road system be maintained according to reasonable standards by the local government, and if not by it, then by the State.

▮ Thus, under state and federal law the State had an affirmative duty to be alert to any failure of local governmental entities to maintain roads and bridges in accord with reasonable standards.

▮ In May 1976, presumably after the city had Mr. Derthick's recommendations dated 4 May 1976, the Director of Public Works for the City of Memphis wrote a letter to the mayor and other officials, with a copy to state officials, including Mr. Derthick, wherein he said the following:

We have not reached a decision as to the best method to use in effecting the necessary permanent repairs. The method chosen will be expensive. We welcome any and all assistance from the County and State—advisory, and especially, financially.

There is no evidence in this record that TDT offered any assistance to Memphis, financially or otherwise, nor did they request any information about Memphis' "decision as to the best method in effecting the *necessary permanent repairs.*" Dialogue between the TDT and Memphis about the Perkins Road Bridge repairs was nonexistent from June 1976 until the bridge collapsed, almost four years later. However, there was one communication between a TDT employee and a Memphis official that lends emphasis to the magnitude of the dereliction of duty on the part of TDT. Larry Ahlhait, a TDT employee, had a telephone conversation with Maynard Stiles, a City of Memphis employee on 4 February 1980, 40 days before the Perkins Road Bridge collapsed. Ahlhait recorded the substance of the conversation in long hand on a Department of Transportation "Memorandum" form, as follows:

Discussion about city being behind in reporting on their FAU bridges and an agreement was reached for the state to pick up the inspection.

On 26 June 1990, three months after the bridge collapsed, Mr. Loveall, then in charge of the Division of Structures, TDT, wrote to the regional engineer in the Jackson, Tennessee office and informed him that the "Department has decided that the future inspection of the City of Memphis FAU bridges will be made by state forces."

In support of their motion for summary judgment, plaintiffs filed the affidavit of

Earl Walters, a civil engineer offered as an expert witness. The affidavit provides in part:

I concur with the conclusions reached by the State of Tennessee regarding the cause of the bridge collapse and its recommendations for repairs as reflected in the bridge inspection report of March 31, 1980, and the bridge evaluation report of April 24, 1980.

Based on my review of the above-listed documents, my education and training as a civil engineer, and my experience in investigating and evaluating structural failures, it is my opinion that if the repairs outlined in the State's April 24, 1980, evaluation report had been made prior to March 16, 1980, the bridge would not have collapsed.

Insofar as this record shows the City of Memphis did not reach a decision or perform the *necessary permanent repairs* that was the subject of the letter from the public works official to the mayor in May 1976. The failure to make the structural repairs and perform channel stabilization, the necessity of which was recognized by Memphis and TDT in 1976 were major causes of the bridge collapse. Under the undisputed facts of this case the State's agency, TDT, was guilty of negligence in failing to monitor necessary permanent repairs by Memphis, and in failing to take over the performance of those repairs at some point in time prior to 16 March 1980, as commanded by state and federal law. The State has offered no excuse or explanation for its glaring neglect of the Perkins Road Bridge, nor did it offer any expert opinion or proof to contradict the affidavit of plaintiff's expert, Walters.

In our opinion plaintiff's proof established as a matter of law the negligence of the State and that its negligence was a proximate cause of the bridge collapse. The State made no response whatever other than its position that as a matter of law the State had no obligation to do *anything* with respect to the Perkins Road Bridge. In that state of the record Rule 56.05 requires a response by the State to show that there is a genuine issue of fact for trial. It failed to do so.

The State has conceded that the life of William Austin was worth in excess of $300,000 and therefore there is no reason to remand this case to the trial court.

The judgment of the Court of Appeals is affirmed on the jurisdiction issue and reversed on the negligence issue. The judgment of the trial court in awarding plaintiffs a recovery against the State of Tennessee in the sum of $300,000 is affirmed, and judgment will be entered in this Court for that sum. Costs are adjudged against the State.

DROWOTA, C.J., and HARBISON, COOPER and O'BRIEN, JJ., concur.

## OPINION ON PETITION TO REHEAR

The State of Tennessee has filed a petition to rehear. The petition disagrees with our interpretation of federal and state law with respect to the State's duties and responsibilities in the area of inspection and maintenance of bridges that are on one of the Federal Aid Highway Systems.

We fully considered the same arguments presented in the petition to rehear in preparing the opinion heretofore released, have considered them again, and continue to adhere to the challenged holdings.

The petition to rehear is respectfully denied at the cost of the State of Tennessee.