No. 70,136

ASHLEY BALL, by and through her next friend, JOSEPH BALL, *Appellant/Cross-appellee*, v. BURNS & McDONNELL and KANSAS DEPARTMENT OF TRANSPORTATION, *Appellees/Cross-appellants.*

(883 P.2d 756)

Opinion filed October 28, 1994.

*John M. Parisi,* of Shamberg, Johnson, Bergman & Morris, Chartered, of Overland Park, argued the cause, and *Victor A. Bergman,* of the same firm, and *Gary R. Mathews,* of Overland Park, were with him on the briefs for appellant/cross-appellee.

*Vicky S. Johnson,* staff attorney, argued the cause, and *Michael B. Rees,* chief counsel, was with her on the brief for the appellee/cross-appellant Kansas Department of Transportation.

*John W. Shaw,* of Bryan Cave, of Kansas City, Missouri, argued the cause, and *R. Jeffrey Harris,* of the same firm, and *Thomas J. Bath, Jr.,* of the same firm, of Overland Park, were with him on the briefs for appellee/cross-appellant Burns & McDonnell.

The opinion of the court was delivered by

ABBOTT, J.: This is a personal injury action arising out of a car-train collision brought by Ashley Ball, a minor, by and through her father, Joseph Ball, alleging a cause of action under the Kansas Tort Claims Act. Plaintiff settled her claims with Johnson County and the Burlington Northern Railway Company, and they are not parties to this appeal. The remaining defendants are the Kansas Department of Transportation (KDOT) and Burns & McDonnell Engineering Company, Inc. (Burns & McDonnell).

Ball appeals from the trial court's granting of summary judgment on issues of duty and immunity, and KDOT and Burns & McDonnell cross-appeal from the denial of summary judgment on the issue of proximate cause. Because we conclude the trial

court correctly determined there was no duty, we do not reach the other issues.

Briefly, the injury occurred as follows: Stephanie Cox (now Stephanie Ball) was driving north on Highway 169 when her car began to lose power. She exited the highway by turning right onto 167th Street in Johnson County, and as she crossed the last of three sets of railroad tracks her car stalled. A Burlington Northern train hit Ball's car. As a result, Ball's daughter, Ashley Ball, then 13 months old and in an infant seat in the back seat of the car, sustained severe and permanent injuries.

Highway 169 at 167th Street was improved as part of a highway improvement project for which KDOT received federal funding. KDOT contracted with Burns & McDonnell for engineering services in designing the improvements. The improvement project was defined as follows: "The design of grading, spot grading, drainage, box bridges, surfacing, and stabilized shoulders from 1.75 miles north of Spring Hill, north approximately 5.25 miles to I-35." Burns & McDonnell agreed, among other things, "[t]o prepare detailed plans and construction drawings in accordance with design criteria recommended by AASHTO and approval by the Federal Highway Administration [FHWA]." KDOT approved the plans submitted by Burns & McDonnell, and the FHWA approved the improvement project on April 19, 1984. On October 3, 1988, the FHWA accepted the project as final.

The events leading to Ashley Ball's injury are largely undisputed. The facts surrounding the injury were stated by the district court in its journal entry granting summary judgment to Burns & McDonnell:

"Just south of 167th Street and 169 Highway intersection, roughly 3/4 of a mile, 169 Highway becomes a four-lane divided highway with paved shoulders. It is designated as a rural section by KDOT. The urban portion of the highway consists of five lanes of traffic with a mountable curb and gutter and a grassy area extending beyond the curb. KDOT made the final decisions on where to locate the improvements to this area. All design plans for this project which Burns & McDonnell submitted to KDOT were approved by KDOT and by the Federal Highway Administration (FHWA).

"KDOT, through its own Bureau of Traffic Engineering, internally developed all traffic control signing plans for this area, with the only exception being that

Burns & McDonnell was to provide signs when it had crews working. The design phase for Burns & McDonnell ended in October of 1984.

"The collision involving Stephanie Cox (now Stephanie Ball) and a Burlington Northern train occurred between 5:30 p.m. and 5:45 p.m. on April 10, 1988. Ms. Ball's daughter, Ashley, was in the car at the time of the collision, and she is the plaintiff in this action.

"Ms. Ball was originally traveling north on Highway 169. She began experiencing car trouble and the speed of her automobile decreased to approximately 25-30 m.p.h. When Ms. Ball reached the intersection of 169 Highway and 167th Street, her speed had decreased to approximately 15 m.p.h. Ms. Ball turned right onto 167th Street and proceeded east, traveling between 5 and 10 m.p.h.

"Ms. Ball intended to continue east on 167th Street to Ridgeview Street to use a friend's phone to call Joe Ball. [Joe Ball is Ashley's father and is now Stephanie's husband.]

"Ms. Ball made no effort to stop her car before reaching the three-track railroad crossing on 167th Street, which is located 51 feet east of 169 Highway. Ms. Ball stated that her brakes at the time were in good condition and that she could have stopped her car before reaching the railroad tracks on 167th Street. Plaintiff's expert, Dr. Berg, confirms that Ms. Ball could have stopped her car within one foot of the tracks in this situation, had she chosen to do so. There was no traffic behind Ms. Ball once she turned off of 169 Highway onto 167th Street.

"Ms. Ball was aware of the railroad tracks located on 167th Street, but she stated that she had never travelled through this intersection before the collision. Ms. Ball looked down two of the three tracks and did not see any trains approaching from the south. There were no railroad cars parked in the area or other obstructions to vision in the area of the crossing. Ms. Ball proceeded east onto the railroad tracks. Her car stalled on the third track, where her car was hit by a Burlington Northern train. Ms. Ball was unaware of the presence of the train until it hit her car."

Plaintiff's action against KDOT and Burns & McDonnell was based in part on the theory that 23 C.F.R. § 646.214(b)(2) (1988) imposed a mandatory duty on KDOT, and on Burns & McDonnell as designer, to install active warning devices at the 167th Street railroad grade crossing or to close the street completely. Both KDOT and Burns & McDonnell moved for summary judgment on a variety of grounds. The district court granted KDOT's motion, finding in part that KDOT was immune from liability under K.S.A. 75-6104, the discretionary function exception to the Kansas Tort Claims Act (KTCA), and that 23 C.F.R. § 646.214(b)(2) was not the source of a mandatory duty because

to apply the regulation to this case would exceed the regulation's enabling statute, 23 U.S.C. § 109(e) (1988). The district court granted Burns & McDonnell's motion for summary judgment, finding that Burns & McDonnell did not have a duty to install active warning devices under 23 C.F.R. § 646.214(b)(2).

On appeal, plaintiff claims that KDOT is liable under the KTCA because of its failure to require installation of automatic crossing gates and flashing light signals at the 167th Street crossing or to close the crossing completely as required for federal-aid highway projects pursuant to 23 C.F.R. § 646.214(b)(2) and that Burns & McDonnell is liable under the same regulation.

The regulation in question, 23 C.F.R. § 646.214(b), provides in pertinent part:

"(2) Pursuant to 23 U.S.C. 109(e), where a railroad-highway grade crossing is located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of the existing roadway, the crossing shall not be opened for unrestricted use by traffic or the project accepted by FHWA until adequate warning devices for the crossing are installed and functioning properly.

"(3)(i) 'Adequate warning devices', under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A) Multiple main line railroad tracks.

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High speed train operation combined with limited sight distance at either single or multiple track crossings.

(D) A combination of high speed and moderately high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses, or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them."

"(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable."

The enabling statute for 23 C.F.R. § 646.214(b)(2) is 23 U.S.C. § 109(e), which provides:

"No funds shall be approved for expenditure on any Federal-aid highway, or highway affected under chapter 2 of this title, unless proper safety protective devices complying with safety standards determined by the Secretary at that time as being adequate shall be installed or be in operation at any highway and railroad grade crossing or drawbridge on that portion of the highway with respect to which such expenditures are to be made."

The trial court held that 23 C.F.R. § 646.214(b)(2) was not the source of a mandatory duty here. The trial court discussed whether the regulation and its enabling statute give rise to a private right of action and ruled that 23 U.S.C. § 109(e) relates only to the federal government's duty as to disbursing funds and imposes no duty on the states. Further, the only sanction for noncompliance under 23 U.S.C. § 109(e) is the withholding of federal funds. The trial court noted the rule that for a regulation to be valid, it must be within the statutory authority conferred upon the agency and held that application of 23 C.F.R. § 646.214(b)(2) to this case would extend the regulation and violate the enabling statute, 23 U.S.C. § 109(e).

Plaintiff first contends that the district court misconstrued the nature of her claim against KDOT. She suggests that the trial court mistakenly interpreted her claim as asserting a private right of action under 23 U.S.C. § 109(e) and 23 C.F.R. § 646.214(b)(2). She makes it clear that her claim is under the KTCA and is derived from the general liability for negligence created by the KTCA. Plaintiff cites *Trout v. Koss Constr. Co.*, 240 Kan. 86, Syl. ¶ 3, 727 P.2d 450 (1986), and *Toumberlin v. Haas*, 236 Kan. 138, Syl. ¶ 2, 689 P.2d 808 (1984): "Although the statutory liability of the state, counties, and townships for defects in highways was repealed by the Kansas Tort Claims Act, a duty to maintain the highways remains under the general liability for negligence created by the Act." Plaintiff points out that the discretionary function exception to liability under the KTCA does not apply where there is a mandatory legal duty. In several of this court's decisions where the State's liability for failure to comply with the Manual on Uniform Traffic Control Devices (MUTCD) was at issue, this court did not discuss a private right of action by virtue of the MUTCD. See, *e.g.*, *Finkbiner v. Clay County*, 238 Kan. 856, 714

P.2d 1380 (1986); *Carpenter v. Johnson*, 231 Kan. 783, 649 P.2d 400 (1982).

KDOT responds by pointing out that the basis for the district court's ruling was that 23 U.S.C. § 109(e) and 23 C.F.R. § 646.214(b)(2) did not create either a private right of action or a mandatory duty and that applying 23 C.F.R. § 646.214(b)(2) to the facts of this case would violate the regulation's enabling statute, 23 U.S.C. § 109(e). KDOT argues that the district court properly understood plaintiff's claim and that the trial court properly found 23 C.F.R. § 646.214(b)(2) could not be applied to the facts of this case. We agree.

The question this court must decide is whether 23 C.F.R. § 646.214(b)(2) could have imposed, and did impose, a duty on KDOT and on Burns & McDonnell to install automatic crossing gates and flashing light signals at the 167th Street railroad crossing.

Plaintiff complains of the district court's ruling that 23 U.S.C. § 109(e) "does not mention any duties for the states at all, and seems to speak more to the Federal government's duty as to funding disbursement. It does not appear as a direct mandate to the states, and even if it is, the only sanction for noncompliance appears to be the withholding of funds."

Plaintiff argues that the district court's discussion and application of *Daye v. Commonwealth of Pennsylvania*, 344 F. Supp. 1337 (E.D. Pa. 1972), and *Mahler v. United States*, 306 F.2d 713 (3d Cir. 1962), was incorrect. In *Daye*, the allegation of liability was based on the State's failure to use reasonable care in the design, construction, and maintenance of a road to prevent the drainage of surface water across the roadway and its failure to insure the installation of adequate guardrails. The court stated, "Neither the Federal-Aid Highway Act, 23 U.S.C. § 101 *et seq.*, nor the Highway Safety Act expressly authorize a suit or cause of action for violation of their provisions." 344 F. Supp. at 1347.

"The statutory language of the Federal-Aid Highway Act clearly indicates that the ultimate responsibility for any safety provisions under the Act lies with the Secretary. The Secretary is given the power to withhold his approval in the event the design or construction of the highway does not meet applicable federal stan-

dards. Moreover, the Secretary is empowered to withhold funds for future projects in the event the highway is not being properly maintained. Consequently, the statutory language militates against the implication of a private remedy in that the express sanction provided in the Act is disqualification of the state for federal funds. It is noteworthy that the circumstances which would disqualify the state are in no way declared unlawful. Moreover, the congressional policy underlying the Act does not mandate an implied private cause of action. In Mahler v. United States, supra, the Third Circuit undertook an extensive and exhaustive review of the legislative history of the Act and concluded:

> 'It seems clear from the Acts of Congress and their accompanying legislative history, that grants-in-aid under the Federal Highway Program were and are designed to encourage states to construct their own highways and that the primary function of the Bureau of Public Roads, in approving plans submitted to it by a state and inspecting roads during and after construction, is that of making sure that federal appropriations are being utilized properly and efficiently by the respective states and are not being wasted.' 306 F.2d at 716.

The Court then concluded in the light of the legislative history that the Act imposes no duty on the United States running to private persons. Since the purpose of the Act is the protection of federal investment, and the sanctions provided therein are directed to fulfill such purpose, we conclude that the Act imposes no duty and no liability on the state other than those specified therein and gives rise to no private cause of action." 344 F. Supp. at 1347.

A discussion of *Mahler* is helpful. There, the plaintiffs sued the United States under the Federal Tort Claims Act after they were injured when the car in which they were riding ran into a large boulder that had fallen from a steep embankment onto the road. The portion of the road on which the injury occurred was constructed in part with funds received under the federal-aid highway program. The plaintiffs asserted that the United States had a duty to the travelling public, imposed by the federal highway program, to make sure that the road where the injury occurred was constructed and maintained properly. Engaging in a thorough discussion of the legislative history, the court concluded that the Congressional intent was to make sure that federal funds were effectively used and not wasted, not to make sure that a member of the travelling public was not injured because of negligence in carrying out the provisions of the program. 306 F.2d at 721. Thus, the federal statutes relating to inspection of highways did not create a duty on the part of the United States to the plaintiffs. 306

F.2d at 722. Another basis for liability was a claim of negligence in approving the plans for construction. The court found that the discretionary function exception to the Federal Tort Claims Act applied to the Secretary's determination of whether or not to approve the design and specifications for a highway project, noting that "the United States [is] not liable for decisions made 'at a planning rather than operational level . . . .' [Citation omitted.]" 306 F.2d at 723.

Plaintiff reasons *Mahler* indicates that although the federal government may have inherited no legal duty from the FHWA statute, states likely did inherit such a duty because, according to plaintiff, states act at the operational, rather than planning, level. Because a state's actions under the regulatory scheme are at the operational end of the spectrum, *Mahler's* holding that policy-oriented decisions are discretionary was inapplicable in *Daye*. Moreover, as *Daye* involved an action against the state, *Mahler*, involving an action against the federal government, was distinguishable and the *Daye* court erred in relying on *Mahler*. Plaintiff also distinguishes *Daye* from the case at bar because under Pennsylvania law a public official is only liable if the official has acted maliciously or with the intent to injure, whereas Kansas law requires only breach of a legal, nondiscretionary duty.

Plaintiff instead points to *Austin v. State*, 796 S.W.2d 449 (Tenn. 1990). Austin involved a bridge in Shelby County, Tennessee, which collapsed. The allegation of liability was based on the state's failure to inspect the bridge. The plaintiff asserted that the state had a duty under 23 U.S.C. § 144 (1988) to inspect and maintain the bridge. That statute provided, in pertinent part:

"The Secretary, in consultation with the States, shall (1) inventory all those highway bridges on any Federal-aid system which are bridges over waterways, other topographical barriers, other highways, and railroads; (2) classify them according to serviceability, safety, and essentiality for public use; (3) based on that classification, assign each a priority for replacement or rehabilitation; and (4) determine the cost of replacing each such bridge with a comparable facility or of rehabilitating such bridge." 23 U.S.C. § 144(b).

The Tennessee Department of Transportation (TDT) established a statewide program for inspection of bridges to comply with 23

U.S.C. § 144, but TDT agreed, with the approval of federal authorities, that Shelby County could conduct its own inspections. Several years later, however, Shelby County notified TDT it would no longer conduct the inspections. The Tennessee Supreme Court stated, "In 23 U.S.C. § 144, Congress used the mandatory word 'shall' in imposing the duties of inventory, inspection, and classification of bridges upon the Secretary of Transportation and the states." 796 S.W.2d at 454. The court acknowledged that the state, through TDT, had attempted to comply with the requirements. The court commented that "[i]t would be difficult to find a more apt example of a mandatory statute than the one under consideration" and held that 23 U.S.C. § 144 mandated that the state inspect and maintain the bridge in question. 796 S.W.2d at 454.

Plaintiff also relies on *CSX Transp., Inc. v. Easterwood*, 507 U.S. ___, 123 L.Ed. 2d 387, 113 S. Ct. 1732 (1993). In *Easterwood*, 23 C.F.R. § 646.214(b)(3)(i) was involved. The issue was whether a railroad's common-law duty to maintain safe railroad grade crossings was preempted by 45 U.S.C. § 434 (1988) of the Federal Railroad Safety Act of 1970 and 23 U.S.C. § 130(d) (1988) of the Highway Safety Act. In interpreting the Highway Safety Act, the Court stated, "This Act makes federal funds available to the States to improve grade crossings, in return for which the States must 'conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose.' 23 U.S.C. § 130(d)." 113 S. Ct. at 1737. The Court also recognized that states are subject to further regulations governing the use of particular warning devices, including compliance with the FHWA's Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD), and that "for projects which involve grade crossings 'located within the limits of or near the terminus of a Federal-aid highway project for construction of a new highway or improvement of [an] existing roadway' . . . or in which 'Federal-aid funds participate in the installation of the [warning] devices,' " automatic gates with flashing light signals are required where cer-

tain conditions exist as enumerated in 23 C.F.R. § 646.214(b)(3)(i). 113 S. Ct. at 1739.

After excluding other sources of preemption, the Court stated, "The remaining potential sources of pre-emption are the provisions of 23 CFR §§ 646.214(b)(3) and (4), which . . . do establish requirements as to the installation of particular warning devices. Examination of these regulations demonstrates that, when they are applicable, state tort law is pre-empted." 113 S. Ct. at 1740-41. The Court concluded, "[A] project for the improvement of a grade crossing must either include an automatic gate or receive FHWA approval if federal funds 'participate in the installation of the [warning] devices.' Thus, . . . §§ 646.214(b)(3) and (4) displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." 113 S. Ct. at 1741. However, the Court went on to hold that because no federal funds were actually used at the railroad grade crossing in question, the claim against the railroad was not preempted.

Plaintiff contends that *Easterwood* makes it clear that 23 C.F.R. § 646.214 imposes a mandatory duty on KDOT and therefore subjects KDOT to liability. KDOT, conversely, reasons that *Easterwood* is inapplicable because the provision of 23 C.F.R. § 646.214(b)(3)(i) based on 23 C.F.R. § 646.214(b)(2) (crossings on federal-aid highways) was not directly at issue; rather, the provision at issue was the portion of 23 C.F.R. § 646.214(b)(3) involving off-system crossings on which federal funds are used to upgrade warning devices.

Easterwood did involve, as KDOT points out, the provision of 23 C.F.R. § 646.214(b)(3)(i) relating to "any project where Federal-aid funds participate in the installation of the [warning] devices" rather than the provision concerning warning devices under 23 C.F.R. § 646.214(b)(2) which is at issue here. Indeed, the Easterwood Court recognized that the issue of the proper application of 23 C.F.R. § 646.214(b)(2) was not before it because there was no claim that the railroad grade crossing where the accident occurred was located in or near the terminus of a federal-aid highway project. 113 S. Ct. at 1741 n.10. Moreover, the en-

abling statute for the provision in 23 C.F.R. § 646.214(b)(3)(i) at issue in *Easterwood* was 23 U.S.C. § 130(d), which the court held specifically imposed a duty on the states. See 113 S. Ct. at 1737. *Easterwood* specifically related only to the effect of 23 C.F.R. § 646.214(b)(3)(i) on railroads, not to whether 23 C.F.R. § 646.214(b)(2) imposed a mandatory duty on states to comply with its provisions as is at issue in the case at bar.

*Mahler* involved an action against the United States, whereas *Daye* and the case at bar involve an action against the state. However, the discussion in *Mahler* holds that the legislative intent was to insure that funds be spent properly and not wasted. Thus, *Mahler* implies, contrary to plaintiff's reasoning, that 23 U.S.C. § 109(e) and 23 C.F.R. § 646.214(b)(2) do not create a mandatory duty on states. In both *Easterwood* and *Austin*, the courts specifically held that the enabling statutes involved, 23 U.S.C. § 130(d) and 23 U.S.C. § 144, imposed specific duties on the states. Here, plaintiff points to no provision of the enabling statute which imposes a mandatory duty on the states. The language of 23 U.S.C. § 109(e), the enabling statute for 23 C.F.R. § 646.214(b)(2), speaks only in terms of the responsibility of the Secretary of Transportation and is silent as to any duties of states receiving funds for federal-aid highway improvement projects.

23 U.S.C. § 109(e) and 23 C.F.R. § 646.214(b)(2) cannot be the sources of a legal, nondiscretionary duty on the part of the state. In any event, there was no duty in the case at bar with respect to the 167th Street crossing, as the discussion below will show.

Plaintiff argues that the railroad crossing at 167th Street was subject to the requirements of 23 C.F.R. § 646.214(b)(2). Plaintiff reasons that the provisions of 23 C.F.R. § 646.214(b)(2) do not require the railroad crossing to be on a federal-aid highway to fall within the regulation; rather, the crossing need only be "within the limits of or near the terminus" of the federal-aid highway project. Plaintiff argues that the 167th Street crossing was within the limits of or near the terminus of the Highway 169 improvement project.

KDOT and Burns & McDonnell respond that the scope of a regulation cannot be broader than its enabling statute. The en-

abling statute here, 23 U.S.C. § 109(e), relates only to "any highway and railroad grade crossing or drawbridge on that portion of the highway with respect to which such expenditures are to be made." Thus, the enabling statute limits the application of 23 C.F.R. § 646.214(b)(2) to crossings on the federal-aid highway system and does not apply to a railroad crossing near an exit from the federal-aid highway project. As the 167th Street crossing is not on the federal-aid highway system, 23 C.F.R. § 646.214(b)(2) does not apply here. Moreover, the requirement of 23 C.F.R. § 646.214(b)(3)(i) for active warning devices in railroad crossings off the federal-aid highway system applies only when federal-aid highway funds participate in the installation of the devices. As in *Easterwood*, no federal funds were used at the 167th Street railroad crossing, and therefore the regulation requiring active warning devices was not triggered. Finally, KDOT reasons that the FHWA approved the plans for and gave its final acceptance of the project, which it could not have done if active warning devices were required by 23 C.F.R. § 646.214(b)(2). Thus, this court should defer to the FHWA's determination that active warning devices were not required at this particular crossing.

We agree with the trial court that to apply 23 C.F.R. § 646.214(b)(2) to the facts of this case would exceed the scope of the enabling statute, 23 U.S.C. § 109(e). The enabling statute only authorizes regulations concerning approving funds for federal-aid highways or highways affected under 23 U.S.C. §§ 201 *et seq.* (1988) (not at issue here), and it provides for warning devices only at "any highway and railroad grade crossing or drawbridge on that portion of the highway with respect to which such expenditures are to be made." 23 U.S.C. § 109(e). While the regulation adopted under 23 U.S.C. § 109(e), 23 C.F.R. § 646.214(b)(2), purports to require active warning devices at railroad grade crossings "located within the limits of or near the terminus of a Federal-aid highway project," the enabling statute limits application of 23 C.F.R. § 646.214(b)(2) to only those crossings which are on federal-aid highway projects.

"[R]egulations, in order to be valid, must be consistent with the statute under which they are promulgated." *United States v.*

*Larionoff*, 431 U.S. 864, 873, 53 L. Ed. 2d 48, 97 S. Ct. 2150 (1977). See *Carpenter v. Johnson*, 231 Kan. 783, 789, 649 P.2d 400 (1982) ("The power to adopt rules and regulations is administrative in nature, not legislative, and to be valid must be within the authority conferred by the legislature."). Thus, the provision of 23 C.F.R. § 646.214(b)(2) requiring active warning devices at crossings "within the limits of or near the terminus of" a project exceeds the authorization of 23 U.S.C. § 109(e) unless limited to crossings on federal-aid highway projects. As 167th Street, the road on which plaintiff was injured, is not a federal-aid highway project, 23 C.F.R. § 646.214(b)(2) cannot require active warning devices at the 167th Street crossing. Therefore, the district court was correct in holding that to apply 23 C.F.R. § 646.214(b)(2) to this case would exceed the authority of 23 U.S.C. § 109(e) and in granting summary judgment to KDOT on this issue.

Finding that to apply 23 C.F.R. § 646.214(b)(2) to the 167th Street crossing would exceed the regulation's enabling statute makes it unnecessary to address whether the 167th Street crossing was "within the limits of or near the terminus of" the Highway 169 federal-aid project such that active warning devices were required.

While we do not reach the issue, we do note that "terminus" as used in 23 C.F.R. § 646.214(b)(2) does not appear to apply to an exit from a highway when the highway does not end at that exit. Black's Law Dictionary 1471 (6th ed. 1990) defines "terminus" as "[i]n the case of a street, road, or railway, either end may be, and commonly is, referred to as the 'terminus.' " Webster's Third New International Dictionary 2359 (1976) defines "terminus" in pertinent part as"1: final goal of a journey or an endeavor; finishing point; END . . . 3a: either end of a transportation line, travel route, pipe line, tunnel, canal." In *Golden Gate Scenic Steamship Lines, Inc. v. Public Utilities Com.*, 57 Cal. 2d 373, 380, 19 Cal. Rptr. 657, 369 P.2d 257 (1962), the Supreme Court of California considered the definition of "terminus" as applied to a common carrier and said: " 'Terminus' is not a word of territorial extent. It is a word connoting the end of a trans-

portation line. (*Nolan v. Public Utilities Com.*, 41 Cal. 2d 392, 397 [8], [260 P.2d 790].)"

Having determined there is no mandatory duty under 23 C.F.R. § 646.214, KDOT did not have a nondiscretionary duty under the KTCA to install active warning devices at the 167th Street railroad crossing. The trial court did not err in granting summary judgment to KDOT on this issue. Likewise, the trial court did not err in granting summary judgment to Burns & McDonnell on the same basis, that Burns & McDonnell had no duty to comply with 23 C.F.R. § 646.214. Having so held, the other issues raised by the parties are moot.

SIX, J., not participating.

ROBERT H. MILLER, C. J. Retired, assigned. ▮